ACCEPTED
15-25-00148-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/22/2025 2:20 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00148-CV**

In the Court of Appeals
for the Fifteenth District of Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/22/2025 2:20:42 PM
CHRISTOPHER A. PRINE
Clerk

—————————————

TEXAS EDUCATION AGENCY,
*Appellant,*

v.

EXCELLENCE 2000, INC. AND SHERWIN ALLEN,
*Appellees.*

—————————————

On Appeal from the 125th Judicial District Court
Harris County, Texas
Cause No. 2022-55524

—————————————

## BRIEF OF APPELLANT

—————————————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

JOE NWAOKORO
Texas Bar No. 24032916
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
512.463-2120 | Fax: 512.320.0667
joe.nwaokoro@oag.texas.gov

COUNSEL FOR APPELLANT

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**
Texas Education Agency

**Appellate and Trial Counsel for Appellant:**
Joe Nwaokoro
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
512.463-2120 | Fax: 512.320.0667
joe.nwaokoro@oag.texas.gov

**Appellee:**
Excellence 2000, Inc.[1]

**Appellate and Trial Counsel for Appellee:**
Melvin Houston
Nikeyla Johnson
3033 Chimney Rock, Suite 610
Houston, Texas 77056
mhouston@gotellmel.com
njohnson@contactjohnsonlawfirm.com

---

[1] As Texas Education Agency ("TEA") noted in its letter to the Clerk of July 28, 2025, the style of the case incorrectly lists Sherwin Allen as an Appellee. As shown in TEA's Notice of Appeal, and in Plaintiff's First Amended Petition, Excellence 2000, Inc. is the sole plaintiff. Mr. Allen was dropped as co-plaintiff in the amended petition pursuant to the trial court's order granting TEA's Special Exceptions.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................... ii

INDEX OF AUTHORITIES .................................................................. iv

RECORD REFERENCES ................................................................... viii

STATEMENT OF THE CASE ............................................................. viii

STATEMENT REGARDING ORAL ARGUMENT ................................. x

ISSUES PRESENTED ........................................................................ x

STATEMENT OF FACTS ................................................................... 2

SUMMARY OF ARGUMENT ............................................................. 12

STANDARD OF REVIEW .................................................................. 13

ARGUMENT .................................................................................... 15

I.    The State has sovereign immunity from trespass-to-try-title actions. ........................................................................ 15

II.   Even assuming it is not a disguised trespass to try title, Excellence lacks standing for a takings claim. ......................... 19

   a.   Excellence lacks standing to assert a takings claim because it has no vested property right. ............................................. 20

   b.   Excellence lacks standing to assert a takings claim because the properties belong to the State as a matter of law. ........... 25

   c.   Excellence's taking claim is not redressable. ......................... 27

III.  Even assuming that this is not a disguised trespass to try title claim, Excellence failed to plead a valid takings claim to overcome TEA's sovereign immunity. ...................................... 29

IV.  As a threshold issue, Excellence has not pleaded and cannot establish that TEA has eminent domain powers. ..................... 30

V.   TEA acted under the scope of a valid contract and did not possess the requisite 'intent to take' under its eminent domain powers. .............................................................. 31

VI.  TEA's actions did not result in a 'taking' of private property. .. 33

VII.  TEA did not acquire Excellence's property for public use under its eminent domain powers. .............................................. 37

PRAYER ....................................................................................... 39

CERTIFICATE OF COMPLIANCE .................................................... 40

CERTIFICATE OF SERVICE ............................................................ 40

APPENDIX .................................................................................... 42

# INDEX OF AUTHORITIES

**Cases**

*Chambers-Liberty Counties Navigation District v. State,*
575 S.W.3d 339 (Tex. 2019) ..................................................................15

*City of Keller v. Hall,*
433 S.W.3d 708 (Tex. App.—Fort Worth 2014, pet. denied)...............35

*City of Keller v. Wilson,*
168 S.W.3d 802 (Tex. 2005) ..................................................................20

*Coastal States Gas Producing Co. v. Pate,*
309 S.W.2d 828 (Tex. 1958) ..................................................................37

*Commons of Lake Houston, Ltd. v. City of Houston,*
711 S.W.3d 666 (Tex. 2025) ..................................................................28

*Dallas Area Rapid Transit v. Whitley,*
104 S.W.3d 540 (Tex. 2003) ..................................................................14

*Gen. Servs. Comm'n v. Little-Tex Insulation Co.,*
39 S.W.3d 591 (Tex. 2001) ....................................................................31

*Hearts Bluff Game Ranch, Inc. v. State,*
381 S.W.3d 468 (Tex. 2012) ..................................................................29

*Heckman v. Williamson County,*
369 S.W.3d 137 (Tex. 2012) .......................................................... 13, 19

*Honors Acad., Inc. v. Tex. Educ. Agency,*
555 S.W.3d 54 (Tex. 2018) ....................................................................20

*Hues v. Warren Petroleum Co.,*
814 S.W.2d 526 (Tex. App. – Houston [14th Dist.] 1991, writ denied)30

*In re Excellence 2000, Inc.*,
  636 B.R. 475, 480-81 (Bankr. S.D. Tex. 2022) ....................................18

*Kennedy Con., Inc. v. Forman*,
  316 S.W.3d 129 (Tex. App. – Houston [14th Dist.] 2010, pet. denied) 16

*King Ranch, Inc. v. Chapman*,
  118 S.W.3d 742 (Tex. 2003) ...............................................................15

*KMS Retail Rowlett, LP v. City of Rowlett*,
  593 S.W.3d 175 (Tex. 2019) ...............................................................37

*LTTS Charter School, Inc. v. C2 Constr., Inc.*,
  342 S.W.3d 73 (Tex. 2011) .................................................................38

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................19

*Martin v. Amerman*,
  133 S.W.3d 262 (Tex. 2004) ...............................................................15

*Matzen v. McLane*,
  659 S.W.3d 381 (Tex. 2021) ...............................................................30

*Rogers v. Ricane Enters., Inc.*,
  884 S.W.2d 763 (Tex. 1994) ...............................................................15

*Sani v. Powell*,
  153 S.W.3d 736 (Tex. App. – Dallas 2005, pet. denied) .......................16

*Scott v. Alphonso Crutch LSC Charter Sch., Inc.*,
  392 S.W.3d 165 (Tex. App. – Austin 2010, pet. denied) (mem. op.) ....21

*State Bar of Tex. v. Gomez*,
  891 S.W.2d 243 (Tex. 1994) ...............................................................19

*State v. Elliott*,
  212 S.W. 695 (Tex. App.—Galveston 1919, writ ref'd) ........................31

*State v. Holland,*
   221 S.W.3d 639 (Tex. 2007) ...................................................................33

*Steele v. City of Houston,*
   603 S.W.2d 786 (Tex. 1980) ...................................................................37

*Tex. Dep't of Transp. v. A.P.I. Pipe and Supply, LLC,*
   397 S.W.3d 162 (Tex. 2013) ...................................................................20

*Tex. Dep't of Transp. v. City of Sunset Valley,*
   146 S.W.3d 637 (Tex. 2004) ...................................................................20

*Tex. Educ. Agency v. Academy of Careers & Tech., Inc.,*
   499 S.W.3d 130 (Tex. App.—Austin 2016, no pet.)............................38

*Tex. Educ. Agency v. Excellence 2000, Inc.,*
   2024 WL 3817123 (Tex. App. – Houston [1st Dist.] Aug. 15, 2024, no.
   pet. h.) (per curiam) (mem. op.)............................................................8

*Tex. Gen. Land Office v. Porretto,*
   369 S.W.3d 276 (Tex. App. – Houston [1st Dist.], 2011), *aff'd in part,*
   *rev'd in part,* 448 S.W.3d 393 (Tex. 2014) ...........................................20

*Tex. Nat. Res. Conservation Comm'n v. IT-Davy,*
   74 S.W.3d 849 (Tex. 2002) .....................................................................18

*Tex. Parks & Wildlife Dep't v. Callaway,*
   971 S.W.2d 145 (Tex. App. – Austin 1998, no writ)...........................18

*Texas Dept. of Parks & Wildlife v. Miranda,*
   133 S.W.3d 217 (Tex. 2004) ...................................................................14

*Transformative Learning Sys. v. Tex. Educ. Agency,*
   572 S.W.3d 281 (Tex. App. – Austin 2018, no pet.) ......................27, 34

**Statutes**

Tex. Edu. Code §12.128......................................................................................36

Tex. Educ. Code § 12.107(a)(1)........................................................................33

Tex. Educ. Code § 12.1071(a) ........................................................ 25, 32

Tex. Educ. Code § 12.128(a) ........................................................ passim

Tex. Educ. Code § 12.128(b)(1) ............................................................ 21

Tex. Educ. Code § 12.128(c)(1) .................................................. 4, 27, 29

Tex. Educ. Code § 45.105(c) ........................................................ 32, 34

Tex. Educ. Code § 7.021 ..................................................................... 30

Tex. Educ. Code §12.128(a)(2) ............................................................ 25

## RECORD REFERENCES

"CR" refers to the clerk's record.  "SuppCR" refers to the supplemental clerk's record.  "RR" refers to the amended reporter's record.

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case:* | Plaintiff formerly operated two open-enrollment charter schools that received state funding.  1 CR 21-23; 2 CR. 1266-1269; 2 RR. 9:21-22. Its charter was revoked in 2016, and Defendant acquired the properties in accordance with Texas law and under the parties' contract. 1 SuppCR. 594.  Plaintiff alleges that Defendant's repossession of the properties constitutes an unlawful governmental taking in violation of Texas Constitution Article I, Section 17. 2 CR. 1266-1270. |
| *Course of Proceedings:* | Defendant filed its first Plea to the Jurisdiction on April 4, 2023, which was denied on April 5, 2024, without assigning reasons. 1 CR. 17-32; 212. Defendant's appeal was denied as untimely.  Defendant also filed Special Exceptions on February 26, 2025, which, among others, challenged Plaintiff's tort claim and co-plaintiff Sherwin Allen's ("Allen") standing.  1 SuppCR. 861.  The Special Exceptions were granted on April 30, 2025.  Defendant filed its second Plea on March 11, 2025.  1 CR.213-230. Pursuant to the trial court's order granting the Special Exceptions, Plaintiff |

amended its petition on June 3, 2025, dismissing Allen as a party and its common law fraud claim. 1 CR. 1285-1286. Following this amendment, on June 12, 2025, Defendant filed its Amended Reasserted Plea to the Jurisdiction, which adopted and incorporated the March 11, 2025, Plea. 2 CR. 1303. The Plea was heard on July 18, 2025. 4 RR. 1-23; 2 CR. 1308.

*Trial Court Disposition:* The Honorable Kyle Carter, 125th Judicial District Court, entered an Order on July 18, 2025, denying Defendant's Plea to the Jurisdiction. 2 CR. 1332; 1338. Defendant then timely filed its Notice of Appeal on July 23, 2025, under Texas Rule of Appellate Procedure 4.2. 2 CR. 1338.

**STATEMENT REGARDING ORAL ARGUMENT**

At the heart of this case is a title dispute masquerading as a takings claim. Defendant respectfully requests that the Court grant oral argument as this case presents issues regarding: (1) whether Plaintiff's takings claim is a disguised trespass-to-try-title action; (2) even assuming it is not a disguised trespass-to-try-title action, whether Plaintiff has standing to assert a takings claim given its admitted use of State funds to acquire the properties, which are presumptively State property under Texas law; and (3) even if it is not a disguised trespass-to-try-title action, whether Plaintiff has alleged an actionable takings claim. Oral argument will assist the Court in evaluating these matters.

**ISSUES PRESENTED**

1. Whether a plaintiff can evade sovereign immunity by framing a trespass-to-try-title claim as a takings claim?

2. Even assuming it is not a disguised trespass-to-try title claim, whether a plaintiff has standing to assert a takings claim when it admitted acquiring real property with State funds?

3. Even if it is not a disguised trespass-to-try title claim, whether the trial court erred by denying Defendant's Plea to the Jurisdiction when Plaintiff failed to plead any of the elements necessary to state

x

a facially valid takings claim or even establish that Defendant has eminent domain powers?

TO THE HONORABLE COURT OF APPEALS:

This is a dispute over ownership of two real properties that the State claimed several years before Plaintiff's lawsuit. Plaintiff Excellence 2000, Inc. ("Excellence") is the former operator of two open-enrollment charter schools, which received state funds under a charter contract. The former charter schools, Children First Academy of Houston and Children First Academy of Dallas, repeatedly self-reported solely state assets on their financial statements, compiled annually by an independent auditor.

Following a lengthy investigation that revealed multiple material violations of the charter contract, Defendant Texas Education Agency ("TEA") revoked Excellence's charter in 2016 and repossessed both properties under Texas law and in accordance with the charter contract's terms. In September 2016, Excellence unsuccessfully sued TEA in Travis County, alleging unlawful taking of these same properties. In that case, Excellence expressly admitted purchasing these properties with State funds and acknowledged that the State claimed ownership. In September 2021, Excellence unsuccessfully filed for Chapter 11 bankruptcy, where

ownership was also litigated. Excellence admitted in filings with the bankruptcy court that the State claimed ownership and stated that its bankruptcy plan depended on who owned these properties.

In September 2022, Excellence filed this lawsuit alleging takings. Pleadings and hearings below centered on ownership of these properties. The trial court erred in denying TEA's Plea to the Jurisdiction because: (i) Excellence's claim is a disguised trespass to try title claim barred by sovereign immunity, (ii) even assuming it is not a disguised trespass to try title claim, Excellence lacks standing for a takings claim, and (iii) even if it is not a camouflaged trespass to try title claim, Excellence failed to plead a viable takings claim. Accordingly, this Court should reverse.

## STATEMENT OF FACTS

This appeal concerns a civil case brought by Appellee Excellence 2000, Inc., which operated an open-enrollment charter school, Children's First Academy, under a 1998 charter contract ("Contract") with Excellence. 1 CR. 6-9; 21-23. The Contract outlined the terms of the agreement between Excellence and TEA. 1 CR. 270-277. Excellence began receiving state funds in 2000. 2 RR. 9:21-22. Excellence purchased

property for the Children First Academy of Houston in November 2001 and property for the Children First Academy of Dallas in 2007. 2 CR. 1008-1009. Excellence's financial audits, which were approved by its board, showed that its revenue came almost exclusively from state funds, with the remainder coming from federal funds. 1 CR. 221-222; 392-676; 2 CR. 678-976. These financial audits establish that Excellence funded its charter school almost entirely with State funds and purchased each school's property with those funds. *Id.*

Materially, the most recent financial audit from 2015 reflects that state funding totaled $5,256,980, federal funding totaled $438,081, and local funding totaled $0. 1 CR. 23; 43. Nothing indicates that private or other local funds were used to purchase school property, make improvements to school property, or make mortgage payments. *Id.*

In 2014, following a lengthy investigation that concluded that Excellence had committed multiple material violations of the Contract, TEA revoked Excellence's charter on July 31, 2016. 2 CR. 949; 1 SuppCR. 594-598.

Section 12.128(c) of the Texas Education Code authorizes TEA to "take possession and assume control of the property" of a charter school that ceases to exist and to supervise the disposition of its assets. Tex. Educ. Code §12.128. Section 12.128(c)(1) provides that TEA "shall direct the charter holder to dispose of the property" of a closed charter school by (i) retaining or liquidating the property and reimbursing the state, (ii) transferring the property to TEA or a school district, (iii) closing the operations of charter school or (iv) any combination of the above. Tex. Educ. Code §12.128(c)(1). TEA's decision "is final and may not be appealed." *Id.*, §12.128(f).

Acting pursuant to its mandatory duty to recover the assets of a closed charter school, TEA repeatedly requested that Excellence return all charter school assets, including real properties. 1 SuppCR 596-607. Excellence failed to comply. *Id.*; *see also* 1 CR. 238. Pursuant to Texas law and the charter contract, and consistent with Excellence's self-reported financial disclosures indicating that the assets belonged to the state, TEA took possession of the charter school's properties after its charter was revoked. 2 CR. 1268; Tex. Educ. Code §12.128.

Excellence does not dispute that assets that belong to the charter school should revert to the state. 4 RR. 13: 24-14:5. It only contends that it owns the real properties because they are titled in its name: "The charter school had assets; books, desks, chairs, and things like that. Those things go back to the State. There's no problem with that. He didn't dispute any of that. But the property, he had clear title to the property from the beginning." 4 RR. 14:1-5. TEA maintained that the Contract required title in the name of the charter holder; hence, title in Excellence's name is immaterial, and the properties are charter school assets that belong to the state because they were purchased with state funds. 1 CR. 221, 276.

Excellence unsuccessfully sued TEA in Travis County, Texas, in September 2016, alleging an unlawful taking of these two properties. 1 CR. 215. In that lawsuit, Excellence expressly admitted using state funds to acquire the properties and acknowledged that TEA claimed ownership. 1 CR. 232-251.

In September 2021, Excellence filed for Chapter 11 bankruptcy, where it litigated ownership of the properties with TEA. 1 CR. 215, 256-

260; 2 CR. 1246-1249. Tellingly, one of the motions that Excellence filed, "Debtor's Unopposed Emergency Motion to Continue Hearing on Ownership and Title," acknowledged that ownership of these properties was disputed, stating as follows:

> 1. This Court had set the hearing *on the title and ownership of the school properties* of the Debtor for Wednesday, December 8, 2021, for 9:00 am.
> …
> 3 This matter involves the *ownership of real properties located in Houston and Dallas. The TEA claims it is the rightful owner of the properties by virtue of providing funds to Excellence 2000. Excellence 2000 claims it is the owner of the properties.*

2 CR. 1246-1249 (emphasis added).

Another motion it filed, "Emergency Motion for Debtor to Extend Date to File Chapter 11 Plan of Reorganization," also recognized that ownership of the property was disputed, stating in part:

> 9. *If the State of Texas owns the Properties*, then the Debtor cannot use the Properties in its reorganization. Further, there may be no need for a reorganization if the State of Texas owns the Properties.
> 10. *The ownership of the Properties is the critical issue in this case. If the Debtor owns the Properties*, then it should be able to assume control and move forward on its reorganization.
> . . .

14. *Until ownership is determined, the case is effectively "on hold."*

15. While the Debtor could file a plan, the plan will depend on ownership. If the State is ultimately determined to own the Properties, then the plan may not and probably is not necessary.

1 CR. 256-260 (emphasis added). Evident in Excellence's pleadings above is its uncertainty on property ownership, notwithstanding that it held title.

On September 1, 2022, Excellence and its former co-plaintiff, Sherwin Allen ("Allen") filed this lawsuit alleging takings and common law fraud, alleging that TEA's repossession of the charter school assets constituted an unlawful taking. 1 CR. 6-12. TEA filed a plea to the jurisdiction on April 4, 2023, which the trial court denied on April 5, 2024, without assigning reasons. 1 CR. 17-32; 212. Regarding takings, TEA's first plea asserted failure to plead a viable takings claim for which immunity is waived for two reasons: (i) state funds were used to acquire the properties; therefore, intent to take cannot be established, and (ii) the purported taking was based on the Contract, and there can be no taking when the state acts under color of right. 1 CR. 17-31. In response to the

plea, Excellence claimed that no state funds were used and the properties were acquired with private funds.  1 CR. 40-50.

TEA did not receive notice of the order denying its plea until May 8, 2024, and filed its first notice of interlocutory appeal on May 16, 2024. 1 SuppCR. 814. The appeal was dismissed as untimely and did not address TEA's jurisdictional arguments. *See Tex. Educ. Agency v. Excellence 2000, Inc.*, No. 01-24-00368-CV, 2024 WL 3817123 (Tex. App. – Houston [1st Dist.] Aug. 15, 2024, no. pet. h.) (per curiam) (mem. op.).

Upon remand, the parties engaged in discovery. Excellence deposed TEA's employees, inspected the properties, and provided written discovery responses.  1 SuppCR. 836-842.  On February 26, 2025, TEA filed Special Exceptions, which, among others, challenged then-plaintiffs' tort claim and co-plaintiff Allen's standing.  1 SuppCR. 861.   The trial court granted the Special Exceptions on April 30, 2025.  TEA filed its second Plea on March 11, 2025.  1 CR.213-230.   Pursuant to the trial court's order granting the Special Exceptions, Excellence amended its petition on June 3, 2025, dismissing Allen as a party and its common law fraud claim.  1 CR. 1285-1286.  Following this amendment, on June 11,

- 8 -

2025, TEA filed its Reasserted Plea to the Jurisdiction, which adopted and incorporated the March 11, 2025, Plea. 2 CR.1298-1300. On June 12, 2025, TEA filed its Amended Reasserted Plea.[2] 2 CR. 1303.

The March 11, 2025 Plea, which was adopted, restated and incorporated into the Amended Reasserted Plea, asserted three new bases for challenging jurisdiction and introduced new evidence to establish that (i) the takings claim is a disguised trespass to try title claim for which immunity is not waived, (ii) lack of standing, and (iii) mootness. *Id.*; 1 CR. 213-230. The newly discovered evidence included Excellence's petition and affidavit in its 2016 lawsuit admitting using state funds to acquire the properties and TEA's ownership claim, pleadings in Excellence's 2021 Chapter 11 bankruptcy where title was also litigated, Excellence's sworn application for property tax exemption in Harris County where it indicated that the Houston property was a charter school asset, and pleadings in a 2023 Harris County case showing that Excellence, Allen and his wife, Jeanette Allen, received $50,000 for

---

[2] The Amended Reasserted Plea made a non-substantive revision to correct a typo in its heading.

an easement on the Houston property that was allegedly wholly taken. *Id.*

Importantly, for the Houston property, undisputed Harris County property tax records show that on April 11, 2002, Excellence filed a sworn "Application for *Private School Property* Tax Exemption for 2001-2002" (emphasis added). 1 CR. 329-387. Excellence's responses indicated that the charter school owned the property; it was not Excellence's private property.

Based on the new evidence, TEA also maintained that the takings claim is unviable and therefore did not waive jurisdiction. The Plea was heard on July 18, 2025. 4 RR. 1-23; 2 CR. 1308.

After repeatedly claiming to have purchased the properties with private funds (2 CR. 1008-1009, 1 CR. 42-43; 2 CR. 979, 1015; 2 RR. 8:11-9:15; 3 RR. 10:1-3), Excellence conceded, in its response to the Plea, that it used state funds to acquire the properties, claiming that "Prior to September 1, 2001, TEA authorized charter schools to purchase private property using state funds." 2 CR. 1308.

At the July 18, 2025, hearing on TEA's Plea, Excellence openly admitted that it used state funds to acquire these properties. 4 RR. 13:8-14:25. The trial court noted that, given this significant admission, it no longer had a fact issue on whether Excellence used state funds to acquire the properties. 4 RR. 13:8-21. Nonetheless, the court denied the plea without assigning reasons. 2 CR. 1302. On July 23, 2025, TEA appealed the trial court's order of July 18, 2025, denying its plea. 2 CR. 1338.

## SUMMARY OF ARGUMENT

The trial court erred in denying TEA's Plea to the Jurisdiction because Excellence's takings claim is, in substance, a disguised trespass to try title claim barred by sovereign immunity. Sovereign immunity is not waived for title disputes, regardless of how they are characterized, and cannot be circumvented through artful pleading.

First, TEA has claimed ownership of the real properties several years before Excellence filed this latest iteration of a takings claim, and the parties have litigated ownership long before Excellence sued. The posture of the case below, including Excellence's feeble efforts to prove ownership, implicated the State's immunity from title disputes. Both parties claim title, making this a title dispute.

Second, even assuming that it is not a title dispute, Excellence lacks standing for a takings claim after admitting that it acquired the properties with State funds. In addition, Excellence's ownership claim is based solely on holding title. But it was required by both the Contract and by statute to hold the title in its time so long as the charter school

was in operation. Therefore, it has no vested interest in the real properties.

Third, even if it is not a disguised trespass to try title claim, no taking occurs when the State asserts title to property it reasonably believes it owns or acts under statutory and contractual rights to recover State property held in trust after charter revocation. There is no taking when the property was not acquired for 'for public use' and Excellence has not even pleaded and established, as a threshold matter, that TEA has eminent domain powers.

Because immunity is not waived for Excellence's camouflaged trespass to try title claim, and even if it is not a disguised trespass to try title claim, Excellence lacks standing, and its claim does not invoke any waiver of TEA's sovereign immunity, this Court should reverse the trial court's decision.

## STANDARD OF REVIEW

"A plea to the jurisdiction challenges the court's authority to decide a case." *Heckman v. Williamson County*, 369 S.W.3d 137, 149 (Tex. 2012). The plaintiff bears the burden to affirmatively demonstrate the trial

court's jurisdiction. *Id.* at 150. "When a plea to the jurisdiction challenges the pleadings, [the court] determine[s] if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Texas Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The court must determine whether it has jurisdiction under the Constitution or by statute at the earliest opportunity. *Id.* "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

Sovereign immunity deprives a trial court of subject-matter jurisdiction in lawsuits against the state unless the state consents to suit. *Tex. Dep't. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). "In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540, 542 (Tex. 2003). It is well established that the State and its agencies enjoy sovereign immunity unless the Legislature has granted an express waiver of immunity. *See, e.g., Wichita Falls State Hosp. v. Taylor*, 106

S.W.3d 692, 694-96 (Tex. 2003). The waiver must be unambiguous. *Id.* Any ambiguities in an alleged waiver of sovereign immunity are construed in the State's favor. *Id.* at 697. This court reviews the trial court's decision *de novo. Chambers-Liberty Counties Navigation District v. State*, 575 S.W.3d 339, 345 (Tex. 2019).

## ARGUMENT

### I. The State has sovereign immunity from trespass-to-try-title actions.

Trespass to try title is "a procedure by which rival claims to title or right of possession may be adjudicated." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 755 (Tex. 2003). "To recover in a trespass to try title action, the plaintiff must recover upon the strength of his own title." *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994). A trespass to try title action is "the method for determining title to ... real property." *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004) (citation omitted).

Title determinations against the State itself are barred by sovereign immunity absent legislative consent to sue. *State v. Lain*, 349 S.W.2d 579, 582 (Tex. 1961). "Any suit that involves a dispute over the

title to land is, in effect, an action in trespass to try title, whatever its form." *Sani v. Powell*, 153 S.W.3d 736, 745 (Tex. App. – Dallas 2005, pet. denied); *see also Kennedy Con., Inc. v. Forman*, 316 S.W.3d 129, 135 (Tex. App. – Houston [14th Dist.] 2010, pet. denied) ("Any suit involving a dispute over the title to land is an action in trespass to try title, whatever its form and regardless of whether legal or equitable relief is sought.").

Here, the parties unambiguously contest title to the two properties at issue. In the court below, Excellence conceded that ownership of these properties is disputed, acknowledging that "there is a fact issue as to ownership and what funds were used to purchase the two properties." 1 CR. 49. Excellence's pleadings below establish that title ownership is disputed: "The crux of immunity claim lies in the ownership of two properties Excellence 2000 purchased to operate its charter schools." 1 CR. 35. "TEA has long completed all administrative functions of closing the schools and now wrongfully alleges it owns the properties instead of Plaintiff and denied Plaintiff access to the two properties. Plaintiff disputes TEA's allegation that it owns the two properties and filed suit."

1 SuppCR. 836. Thus, Excellence concedes that this is a title dispute: it filed suit to challenge TEA's ownership claim.

Further, in a hearing on the first plea, the trial court distilled the issue to an ownership dispute: "If they spent the State's money to bu[y] this property, then it's the State's. If they used their own money, then there's a question there that I have." 3 RR. 12:21-24.

As shown above, the ownership dispute long predated this lawsuit. Excellence conceded in its 2016 lawsuit that TEA claimed ownership. 1 CR. 237-238, 250. For example, it alleged in its prior unsuccessful lawsuit that it "was directed to execute[] deeds to the property in favor of the Texas Education Agency and to turn over all keys to the buildings, vehicles, and other similar property", 1 CR. 238, and that "[TEA] has persisted in demanding that Excellence 2000, Inc. execute deeds to both the Dallas and Houston properties to TEA claiming the buildings are now 'owned' by TEA." 1 CR. 240.

Excellence also conceded in its Chapter 11 bankruptcy that ownership of these properties was contested. 1 CR. 215, 255-260; 2 CR. 1246-1249. The bankruptcy court's order denying one of Excellence's

motions reiterated that ownership was disputed. *In re Excellence 2000, Inc.*, 636 B.R. 475, 480-81 (Bankr. S.D. Tex. 2022). Because this case involves a dispute of ownership of real property, it is a trespass to try title claim masquerading as a takings claim.

Excellence's lawsuit is merely creative pleading to circumvent TEA's sovereign immunity. Excellence is basically asserting a trespass to try title claim without the required legislative consent, fully recognizing that TEA has long claimed ownership. Its lawsuit is a disguised trespass to try title claim that is barred by sovereign immunity. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855-56 (Tex. 2002). It is well-settled that a suit for title to real property of the State or one of its agencies may not be maintained without legislative consent. *Tex. Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 152 (Tex. App. – Austin 1998, no writ) ("A suit for title to land against the state or its agency cannot be maintained without legislative consent."). Excellence's takings claim requires trying the State's title to the disputed property, which is barred by sovereign immunity. *Lain*, 349 S.W.2d at 582. This Court should therefore reverse for lack of jurisdiction.

## II. Even assuming it is not a disguised trespass to try title, Excellence lacks standing for a takings claim.

Even assuming that Excellence's takings claim is not a disguised trespass-to-try title, it lacks standing to assert a takings claim. "A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman,* 369 S.W.3d at 150. "Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable." *State Bar of Tex. v. Gomez,* 891 S.W.2d 243, 245 (Tex. 1994). "If the plaintiff lacks standing to bring *any* of his claims, the court must dismiss the whole action for want of jurisdiction." *Id.* at 150–51 (emphasis in original).

To establish standing, a plaintiff must meet three elements: (1) an injury-in-fact that has (2) a causal connection to the complained-of conduct which is "fairly traceable" to the challenged action of the defendant, and (3) the injury is likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).

"It is fundamental that, to recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property

taken." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644 (Tex. 2004). The plaintiff bears the burden of proving an ownership interest in the allegedly taken property. *Tex. Gen. Land Office v. Porretto*, 369 S.W.3d 276, 288 (Tex. App. – Houston [1st Dist.], 2011), *aff'd in part, rev'd in part*, 448 S.W.3d 393 (Tex. 2014).

### a. Excellence lacks standing to assert a takings claim because it has no vested property right.

If the party bringing the suit does not own the disputed land, the takings claim is not viable, and the trial court lacks jurisdiction to hear the case. *Tex. Dep't of Transp. v. A.P.I. Pipe and Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013). To have standing to sue for takings, a party must have a vested property interest at the time of the alleged taking. *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005). A vested right is "something more than a mere expectancy based upon an anticipated continuance of an existing law." *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018). A right is "vested" when it has some definitive, rather than potential, existence. *Scott v. Alphonso Crutch LSC*

- 20 -

*Charter Sch., Inc.*, 392 S.W.3d 165, 171 (Tex. App. – Austin 2010, pet. denied) (mem. op.).

Section 12.128(b)(1) of the Texas Education Code states: "Subject to Subsection (b-2), while an open-enrollment charter school is in operation, *the charter holder holds title to any property* described by Subsection (a) or (b) and may exercise complete control over the property as permitted under the law." Tex. Educ. Code § 12.128(b)(1) (emphasis added). Subsection (a) relates to property purchased with funds received by a charter school, while subsection (b) relates to property purchased before September 1, 2001, with at least 50% public funds. *Id.* § 12.128(a), (b). Here, Excellence has admitted to purchasing these properties with State funds. At the hearing on TEA's Plea, Excellence admitted that it used state funds to acquire these properties. 4 RR. 13:8-14:25.

Thus, under the Texas Education Code, Excellence had a right and duty to hold title to the two real properties in its name. That right and duty ended once its charter was revoked and the school closed. Tex. Educ. Code § 12.128(b)(1).

Excellence was also required by the Contract to hold title in its name. Section 36 of the Contract states in pertinent part: "*Charterholder shall have and maintain throughout the term of the charter* a lease agreement, *title or other legal instrument granting to Charterholder the right to occupy and use one or more facilities* suitable for use as the charter school facilities described by the charter." 1 CR. 276 (emphasis added). Thus, it held title in its name at TEA's behest.

Excellence's claim of ownership hinges solely on possessing title; however, it lacks a vested property interest because (i) it was required by law and by the Contract to keep title in its name, and (ii) the right and duty to hold title ended upon revocation of its charter. However, merely having title cannot be equated with personal ownership, distinct and separate from operating the charter school.

It is evident from the foregoing that Excellence's interests in the two properties are not vested but instead are "mere expectancies" created by the law and the Contract. Excellence's title is therefore contingent on the continuation of its charter and operation of a school, not definite.

Instructively, TEA specifically cited violation of Section 36 of the Contract in its investigative report dated November 17, 2014, relating to the Dallas property, after discovering a recording of personal ownership interest in the charter school's property. 1 CR. 220-221; 292-316. TEA cited Excellence for breach of Section 36 of the Contract. 1 CR. 293. Excellence and Allen neither questioned TEA's authority, contended that the Dallas property was privately owned, nor alleged that it was not a charter school asset. 1 CR. 310-316. Instead, the breach was cured by promptly reconveying the property to Excellence. *Id.* The deed would not have been transferred back to Excellence to remedy the breach were it not a charter school asset.

Further, Excellence admitted in its prior lawsuit: "The Houston property was purchased prior to September 1, 2001, and *partially paid for with non-public funds.*" 1 CR. 250 (emphasis added). Excellence further conceded that, for the Houston property, "$145,000 was paid using private funds, and *state funds were used to pay the remaining balance of about $565,000.00*" (emphasis added). 1 CR. 236. It claimed a "vested property interest in its deeds and the equity value of its real

estate which is in excess of the amount of *state funds used to purchase the* lease [sic] *property*." 1 CR. 241. (emphasis added).

That Excellence sought to recover "the equity value … in excess of the amount of state funds used to purchase the … property" is telling, and again, recognizes that state funds were used to buy both properties. Pleadings in another case that are inconsistent with a party's position in a present action are evidence. Excellence's admission that these properties were assets of the charter school, and therefore, state assets, predated this lawsuit.

Moreover, as shown above, in its response to the Plea, Excellence admitted using state funds to purchase the properties, claiming that "TEA authorized charter schools to purchase private property using state funds." 2 CR. 1308. At the hearing on the Plea, it also conceded using state funds to acquire these properties. 4 RR. 13:8-14:25. These admissions are fatal to its claim.

**b. Excellence lacks standing to assert a takings claim because the properties belong to the State as a matter of law.**

Even if it is not a camouflaged trespass to try title claim, Excellence still lacks standing for a takings claim because the two properties belong to TEA as a matter of law. TEA's undisputed evidence shows that Excellence used funds received after September 2, 2001; consequently, under Section 12.128(a), these two properties are "property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school." Tex. Educ. Code §12.128(a)(2). When Excellence's charter was revoked and its schools ceased to operate, Section 12.128(c) authorized TEA to take possession and assume control of these two properties. *Id.* at §12.128(c).

This is the law, and Excellence agreed to this outcome when it accepted funding from the State. "A charter holder who accepts state funds under Section 12.106 after the effective date of a provision of this subchapter agrees to be subject to that provision, regardless of the date on which the charter holder's charter was granted." Tex. Educ. Code § 12.1071(a).

Excellence's audited financial statements not only agree that the assets it acquired with public funds constitute public property under Chapter 12 of the Texas Education Code but also reflect 100% state ownership of the Dallas and Houston properties. 1 CR. 221-222; 392-676; 2 CR. 681-976. And as shown above, in its response to the Plea and at the July 18, 2025, hearing, Excellence changed course when confronted with its past admission of using state funds to purchase the properties: after repeatedly insisting that it purchased the properties with only private funds (2 CR. 1008-1009, 1 CR. 42-43; 2 CR. 979, 1015; 2 RR. 8:11-9:15; 3 RR. 10:1-3), it openly admitted that it bought them with state funds. 2 CR. 1308; 4 RR. 13:8-14:25.

Section 12.128 of the Education Code states that if state funds contributed to the purchase of charter school property, that property becomes state property even if private funds were also used: "property purchased with state funds received by a charter holder . . . after September 1, 2001: (1) is considered to be public property for all purposes under state law; (2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter

school; and (3) may be used only for a purpose for which a school district may use school district property." Tex. Educ. Code § 12.128(a). These properties were bought after September 1, 2001. 1 CR.288-289.

Section 12.128 outlines the requirements and scope of TEA's authority to take possession of charter school property. *Transformative Learning Sys. v. Tex. Educ. Agency*, 572 S.W.3d 281, 287 (Tex. App. – Austin 2018, no pet.). When a school's charter is revoked and ceases to operate, TEA must seize school property that the charter holder purchased using any state funds received after September 1, 2001. *Id.* at 287–88; *see also* Tex. Educ. Code § 12.128(c)(1). This operates based on *when the funds were received, not when the property was purchased. See Transformative Learning Sys.*, 572 S.W.3d at 287–88. A purchase "encompasses the act of acquiring property by paying the entire purchase price at the time of sale or over time through mortgage payments." *Id.* at 289.

### c. Excellence's taking claim is not redressable.

"[S]tanding requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order." *Commons of Lake*

*Houston, Ltd. v. City of Houston*, 711 S.W.3d 666, 687 (Tex. 2025) (citation omitted). Section 12.128(a) of the Texas Education Code states that property purchased with state funds received by a charter holder is "considered to be public property for all purposes under state" and is "held in trust by the charter holder." Tex. Educ. Code § 12.128(a). Critically, Section 12.128(c) authorizes TEA to "(1) take possession and assume control of the property described by Subsection (a) of an open-enrollment charter school that ceases to operate; and (2) supervise the disposition of the property in accordance with this subchapter." *Id.* §12.128(c).

As discussed above, once a charter school ceases to operate, for property purchased with state funds, Section 12.128(c) of the Texas Education Code empowers TEA to "take possession and assume control of the property" and supervise the disposition of its assets. Tex. Educ. Code §12.128. Section 12.128(c)(1) provides that TEA "shall direct the charter holder to dispose of the property" of a closed charter school by (i) retaining or liquidating the property and reimbursing the state, (ii) transferring the property to TEA or a school district, (iii) closing the

- 28 -

operations of charter school or (iv) any combination of the above. Tex. Educ. Code §12.128(c)(1). TEA's decision "is final and may not be appealed." *Id.*, §12.128(f).

Excellence repeatedly rebuffed TEA's request to return all charter school assets and transfer the deed to the agency. TEA's directive is unappealable. Excellence's lawsuit seeks to circumvent the statutory bar on challenging TEA's decision regarding the assets of a closed charter school. As such, Excellence's claim is not redressable.

## III. Even assuming that this is not a disguised trespass to try title claim, Excellence failed to plead a valid takings claim to overcome TEA's sovereign immunity.

Even if Excellence's takings claim is not a disguised trespass-to-try title, it still failed to plead a viable takings claim to overcome TEA's sovereign immunity. "In the absence of a properly pled takings claim, the state retains immunity." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012).

To establish a viable governmental takings claim, a plaintiff must demonstrate: "(1) the State intentionally performed certain acts, (2) that resulted in a 'taking' of property, (3) for public use." *Matzen v. McLane*,

659 S.W.3d 381, 393 (Tex. 2021) (citation omitted). Because Excellence has not even established that TEA has eminent domain powers, much less sufficiently alleged any of these takings' elements, its takings claim is barred by TEA's sovereign immunity. Therefore, this Court should reverse and remand with instructions to dismiss Excellence's suit.

## IV. As a threshold issue, Excellence has not pleaded and cannot establish that TEA has eminent domain powers.

Conspicuously absent in Excellence's pleadings below is any showing that TEA has eminent domain powers to support its takings allegation. Nowhere in its pleadings below does Excellence cite to any authority to even suggest that TEA has or acted pursuant to its eminent domain powers. The statutory powers that the Texas Legislature conferred on TEA do not include the power of eminent domain. *See* Tex. Educ. Code § 7.021 (listing TEA's powers and duties). TEA never claimed to act pursuant to eminent domain powers.

In *Hues v. Warren Petroleum Co.*, 814 S.W.2d 526, 531 (Tex. App. – Houston [14th Dist.] 1991, writ denied), the Fourteenth Court of Appeals rejected a takings claim because, among others, defendants had "no powers of eminent domain, and therefore, did not have any right of

inverse condemnation." Similarly, Excellence's claim fails for the independent reason that it failed to show, as an initial matter, that TEA even has eminent domain powers. TEA did not claim to exercise eminent domain powers but rather exercised its statutory right to repossess state property after the charter was revoked. Tex. Educ. Code § 12.128(c).

### V. TEA acted under the scope of a valid contract and did not possess the requisite 'intent to take' under its eminent domain powers.

"Texas courts have long recognized that the State wears two hats: the State as a party to the contract and the State as sovereign." *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001); *see also Federal Sign v. Texas Southern University,* 951 S.W.2d 401, 405 (Tex. 1997). When acting as a party to a contract, the State does not have the 'intent to take' under its eminent domain powers:

> The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers. In this situation, the State does not have the intent to take under its eminent domain powers; the State only has an intent to act within the scope of the contract.

*Little-Tex Insulation Co.*, 39 S.W.3d at 599 (citation omitted). Such is the case here. As discussed above, Excellence entered into the Contract with

TEA to operate an open-enrollment charter school. 1 CR. 270-277. The Contract was "conditioned on full and timely compliance by [Excellence] with. . . applicable law." 1 CR.277.

The Contract requires that all financial transactions be "separately and clearly reflected in the accounting, auditing, budgeting, reporting, and record keeping systems of the charter school." 1 CR.274 at ¶27. Additionally, Excellence "shall not apply, hold, credit, transfer, or otherwise make use of funds, assets or resources of the charter school for any purpose other than the operation of the charter school described in the charter." *Id*. These terms of the Contract mirror Texas law. *See* Tex. Educ. Code § 12.107(a); Tex. Educ. Code § 45.105(c) (delimiting the use of local funds).

Excellence does not dispute the veracity of the investigation, which found material violations of the Contract—many of which were financial—or the resulting revocation of the charter. 1 CR.292-301; 1 SuppCR. 592. Therefore, TEA acted under the Contract and relevant Texas law by repossessing the school's property after the charter was revoked. Tex. Educ. Code § 12.128(c).

Excellence cited *State v. Holland*, 221 S.W.3d 639 (Tex. 2007), in its trial court briefing below.  Ironically, *Holland* held that because the State acted in accordance with a contract—*even in the absence of an express contract*—it lacked the requisite "intent to take," thereby retaining its sovereign immunity. *Id.*

Similarly, here, even if Excellence can establish that TEA has, and acted pursuant to, its eminent domain powers, TEA's actions in repossessing the State's property were taken under the terms and scope of the Contract.  Therefore, TEA lacked the requisite intent to take under as a matter of law. For this reason alone, the trial court's decision should be reversed, and Excellence's claim should be dismissed as barred by sovereign immunity.

## VI. TEA's actions did not result in a 'taking' of private property.

Under Texas law, state funds received "by a charter holder . . . are considered to be public funds for all purposes under state law[.]" Tex. Educ. Code § 12.107(a)(1). The state funds received by a charter holder are "held in trust . . . for the benefit of the students of the open-enrollment charter school." *Id.* § 12.107(a)(2). Texas law prohibits the charter holder

from using these state funds held in trust for non-trust purposes. *Id.* § 12.107(a); § 45.105(c).

The Texas Education Code stipulates that property purchased with state funds received by a charter holder after September 1, 2001 "(1) is considered to be public property for all purposes under state law; (2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school; and (3) may be used only for a purpose for which a school district may use school district property." Tex. Educ. Code § 12.128(a). If the open-enrollment charter school later ceases to operate, Section 12.128 requires TEA to "take possession and assume control" of this public property. *Id.* § 12.128(c). Section 12.128 operates based on when the funds were received, not when the property was purchased. *See Transformative Learning Sys.* 572 S.W.3d at 287-88. Further, a purchase "encompasses the act of acquiring property by paying the entire purchase price at the time of sale or over time through mortgage payments," *not just its initial purchase. Id.* at 289.

A 'taking' only occurs when the government takes or otherwise unreasonably interferes with an owner's right to use or enjoy their

*private* property. *City of Keller v. Hall*, 433 S.W.3d 708, 713 (Tex. App.—Fort Worth 2014, pet. denied). Here, Excellence acknowledges it began receiving state funds in 2000. 2 RR. 9:21-22.

Excellence purchased its Houston property in November 2001 and its Dallas property in 2007. 1 CR.288-289. Because both properties were purchased post-September 1, 2001, and Excellence had already been receiving state funds for approximately one year, the presumption is that the properties are public property; public property does not fall under the purview of a 'taking.' Tex. Educ. Code § 12.128(a); *Hall*, 433 S.W.3d at 713. Excellence has not and cannot rebut this presumption.

All evidence, including audits approved by Excellence's board (1 CR. 221-222; 392-676; 2 CR. 678-976), belies Excellence's prior inconsistent assertion that it never commingled funds and that the properties were purchased solely with private funds, and Excellence cannot overcome the state property presumption. Additionally, even if Excellence used private funds, it has not even kept sufficiently detailed financial records and conceded that it simply does not have the records

- 35 -

needed to sufficiently trace and segregate state and private funds. 2 RR. 11:13-12:7; 3 RR.11:17-12:10.

Significantly, after repeatedly stridently claiming to have purchased the properties with private funds (2 CR. 1008-1009, 1 CR. 42-43; 2 CR. 979, 1015; 2 RR. 8:11-9:15; 3 RR. 10:1-3) and introducing a sham affidavit to support its false claim (1 CR. 60-62), once Excellence was confronted with its admission in its 2016 lawsuit that it purchased the properties with state funds, Excellence conceded that it indeed purchased the properties with state funds. 1 CR. 236 at ¶13; 1 CR. 250; 2 CR. 1308; 4 RR. 13:8-14:25.

Therefore, by relevant law and Excellence's admissions, TEA properly determined that the properties are state property and repossessed them upon charter revocation, as authorized by Section 12.128 of the Texas Education Code. Tex. Edu. Code §12.128. Because they are state, not private property, they were not 'taken.' Excellence's takings claim is barred by sovereign immunity, and the trial court's decision should be reversed.

## VII. TEA did not acquire Excellence's property for public use under its eminent domain powers.

"Property is taken for public use only when there results to the public some definite right or use in the business or undertaking to which the property is devoted." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 186–87 (Tex. 2019) (internal quotations omitted); *see also Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 833 (Tex. 1958). "It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it." *KMS Retail Rowlett*, 593 S.W.3d at 187 (citation omitted). Public use is defined solely as *public works*. *Steele v. City of Houston*, 603 S.W.2d 786, 790 (Tex. 1980). The Texas Constitution "limits compensation to damages 'for or applied to public use,' and judicial restraints have narrowed that phrase to damages which arise out of or as an incident to some kind of public works." *Id*. This case has nothing to do with *public works*. Hence, Excellence has neither alleged nor established that TEA acquired the properties for public use.

Further, "[b]ecause the state provides funds to charter schools to be used exclusively for a public purpose, there is nothing unconstitutional about its taking possession of property that the charter school purchases with those funds—what the Legislature giveth, the Legislature may taketh away." *Acad. of Careers & Tech., Inc.*, 499 S.W.3d at 136 (citation and internal quotations omitted). "Charter schools are creatures of statute that are an integral part of Texas's public-education system and may be considered governmental units." *Tex. Educ. Agency v. Academy of Careers & Tech., Inc.*, 499 S.W.3d 130, 135 (Tex. App.—Austin 2016, no pet.); *see also LTTS Charter School, Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 76 (Tex. 2011)(noting that charter schools "are indisputably part of the Texas public-education system"); *id.* at 78 (noting that charter schools' status and authority "derive wholly from the comprehensive statutory regime"); *id.* at 82 ("Open-enrollment charter schools are governmental units for Tort Claims Act purposes ....").

Thus, even if TEA has eminent domain powers, TEA did not acquire the properties for public use but rather reclaimed state property

pursuant to Excellence's admissions and self-reported disclosures, consistent with Texas law, and under the Contract.

## PRAYER

For the foregoing reasons, this Court should reverse the judgment of the trial court below and dismiss Excellence's case with prejudice.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney
General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil

**KIMBERLY GDULA**
Chief, General Litigation Division

*/s/ Joe Nwaokoro*
**JOE NWAOKORO**
Assistant Attorney General
Texas Bar No. 24032916
General Litigation Division

Office of the Attorney General

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Joe.nwaokoro@oag.texas.gov
(512) 463-2120/Fax (512) 320-0667

***ATTORNEYS FOR
DEFENDANT-APPELLANT***

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 7,122 words, excluding parts exempted by Tex. R. App. P. 9.4 (i)(1).

/s/ *Joe Nwaokoro*
JOE NWAOKORO
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served electronically through the electronic filing manager in

accordance with Tex. R. App. P. 9.5(b)(1) on the 22nd day of September

2025, to:

Melvin Houston
3033 Chimney Rock, Suite 610
Houston, Texas 77056
mhouston@gotellmel.com

Nikeyla Johnson
3033 Chimney Rock, Suite 610
Houston, Texas 77056
njohnson@contactjohnsonlawfirm.com

*Counsel for Appellee*

/s/ *Joe Nwaokoro*
JOE NWAOKORO
Assistant Attorney General

**No. 15-25-00148-CV**

In the Court of Appeals
for the Fifteenth District of Texas

_____

TEXAS EDUCATION AGENCY,
*Appellant,*

v.

EXCELLENCE 2000, INC. AND SHERWIN ALLEN,
*Appellees.*

_____

On Appeal from the 125th Judicial District Court
Harris County, Texas
Cause No. 2022-55524

_____

**APPENDIX**

_____

| Tab 1 | Order Denying TEA's Plea to the Jurisdiction. 2 CR. 1332 | Appx. 001-002 |
| Tab 2 | Charter Contract. 1 CR. 270-277 | Appx. 003-0011 |
| Tab 3 | Plaintiff's 2016 Lawsuit. 1 CR. 232-251 | Appx. 0012-0032 |
| Tab 4 | Tex. Educ. Code §12.107 | Appx. 0033-0035 |
| Tab 5 | Tex. Educ. Code §12.128 | Appx. 0036-0040 |
| Tab 6 | Tex. Educ. Code §12.1281 | Appx. 0041-0044 |

Tab 7          Tex. Educ. Code §45.105          Appx. 0045-0048

T<small>AB</small> 1:

O<small>RDER</small> D<small>ENYING</small> TEA'<small>S</small> P<small>LEA TO THE</small> J<small>URISDICTION</small>. 2 CR. 1332

6/12/2025 12:58:15 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 101943629
By: ANDERS, REGINA C
Filed: 6/12/2025 12:58:15 PM

Pgs-1

PJURY

CAUSE NO. 2022-55524

| | | |
|---|---|---|
| **EXCELLENCE 2000 INC.** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | **125TH JUDICIAL DISTRICT** |
| v. | § | |
| | § | |
| **TEXAS EDUCATION AGENCY** | § | **HARRIS COUNTY, TEXAS** |
| *Defendant.* | § | |

---

## ORDER ON DEFENDANT'S PLEA TO THE JURISDICTION

---

On this day the Court considered Defendant Texas Education Agency's Amended Reasserted Plea to the Jurisdiction (the "Plea"). Upon consideration of the Plea, the responses and replies on file, and the arguments of counsel, the Court has determined that the Plea is not meritorious. It is therefore ORDERED that Defendant's Plea is hereby ~~GRANTED. All claims against Defendant are hereby~~ ~~DISMISSED.~~ DENIED.

SO ORDERED.

Signed on this _____, 2025.

Signed:
7/18/2025

_____
JUDGE PRESIDING

**Appx. 002**

1332

Appx. 003

Tab 2:

Charter Contract. 1 CR. 270-277

## CONTRACT FOR CHARTER

This contract is executed the 28th day of Sept. 1998 between the Texas State Board of Education (the "Board") and Excellence 2000, Inc. ("Charterholder") for an open-enrollment charter to operate a Texas public school.

### General

1. **Definitions.** As used in this contract:

   "Charter" means the open-enrollment charter, as provided by Subchapter D, Chapter 12, Texas Education Code (TEC), granted by this contract.

   "Charter school" means the open-enrollment charter school. Charterholder agrees to operate as provided in this contract. The charter school is a Texas public school.

   "Agency" means the Texas Education Agency.

2. **The Charter.** This contract grants to Charterholder an open-enrollment charter under Subchapter D, Chapter 12, TEC. The terms of the charter include: (a) this contract; (b) applicable law; (c) Request for Application #701-98-016; (d) any condition, amendment, modification, revision or other change to the charter adopted or ratified by the Board; (e) all statements, assurances, commitments and representations made by Charterholder in its application for charter, attachments or related documents, to the extent consistent with (a) through (d); and (f) assurance by Charterholder, evidenced by execution of this contract, that no false information was submitted to the Agency or the Board by Charterholder, its agents or employees in support of its application for charter.

3. **Authority Granted by Charter.** The charter authorizes Charterholder to operate a charter school subject to the terms of the charter. Action inconsistent with the terms of the charter shall constitute a material violation of the charter.

4. **Alienation of Charter.** The charter may not be assigned, encumbered, pledged or in any way alienated for the benefit of creditors or otherwise. Charterholder may not delegate, assign, subcontract or otherwise alienate any of its rights or responsibilities under the charter. Any attempt to do so shall be null and void and of no force or effect; provided, however, that Charterholder may contract at fair market value for services necessary to carry out policies adopted by Charterholder or the governing body of the charter school.

5. **Term of Charter.** The charter shall be in effect from October 5th, 1998 through July 31, 2003, unless renewed or terminated.

**Appx. 004**

270

TEA-0000202

6. Renewal of Charter. On timely application by Charterholder in a manner prescribed by the Board, the charter may be renewed for an additional period determined by the Board. The charter may be renewed only by written amendment approved by vote of the Board and properly executed by its chair.

7. Revision by Agreement. The terms of the charter may be revised with the consent of Charterholder by written amendment approved by vote of the Board. The commissioner of education ("the commissioner") may revise the charter on a provisional basis during an interim between Board meetings; however, such action shall expire unless ratified by the Board at its next regular meeting. Nothing in this paragraph limits the authority of the Board or the commissioner to act in accordance with other provisions of this contract.

## Students

8. Open Enrollment. Admission and enrollment of students shall be open to any person who resides within the geographic boundaries stated in the charter and who is eligible for admission based on lawful criteria identified in the charter. Total enrollment shall not exceed _125_ students. The charter school's admission policy shall prohibit discrimination on the basis of sex, national origin, ethnicity, religion, disability, academic or athletic ability, or the district the student would otherwise attend. Students who reside outside the geographic boundaries stated in the charter shall not be admitted to the charter school until all eligible applicants who reside within the boundaries have been enrolled.

9. Public Education Grant Students. Charterholder shall adopt an express policy providing for the admission of, and shall admit under such policy, students eligible for a public education grant, including those students who reside outside the geographic area identified in the charter application, under Subchapter G, Chapter 29, TEC.

10. Non-discrimination. The educational program of the charter school shall be nonsectarian, and shall not discriminate against any student or employee on the basis of race, creed, sex, national origin, religion, disability or need for special education services.

11. Children with Disabilities. The charter school is a "local educational agency" as defined by federal law. Charterholder must comply with the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1401, et seq., and implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §794, and implementing regulations; Title II of the Americans with Disabilities Act, 42 U.S.C. §12131-12165, and implementing regulations; Chapter 29, TEC, and implementing rules; and the many court cases applying these laws. For example:

167

**Appx. 005**

271

TEA-0000203

(a) Child Find. Charterholder must adopt and implement policies and practices that affirmatively seek out, identify, locate, and evaluate children with disabilities enrolled in the charter school or contacting the charter school regarding enrollment, and must develop and implement a practical method to determine which children with disabilities are currently receiving needed special education and related services. For each eligible child, Charterholder must develop and offer an individualized education plan appropriate to the needs of that student.

(b) Free Appropriate Public Education. Charterholder must provide a free appropriate public education to all children with disabilities otherwise eligible to enroll in the charter school. If the program, staff or facilities of the charter school are not capable of meeting the needs of a particular child, Charterholder must implement changes necessary to accommodate the child at the charter school. If reasonable accommodations would be insufficient to enable the child to benefit from the charter school's program, Charterholder must, at its own expense, place the child at an appropriate school.

(c) Services to Expelled Students. Charterholder must continue to provide a free appropriate public education to a child with disabilities even after expelling or suspending the child for valid disciplinary reasons. This obligation to serve the child continues until the end of the school year.

(d) Monitoring. The charter school's implementation of the laws governing education of children with disabilities will be monitored for compliance by the United States Department of Education, Office of Special Education Programs; the United States Department of Education, Office of Civil Rights; the Texas Education Agency; and others. This monitoring activity includes responding to complaints, random on-site inspections and other investigations by the enforcing agencies, and will result in corrective actions imposed on Charterholder by these agencies for all discrepancies found.

(e) Due Process Hearings. The charter school's implementation of the laws governing education of children with disabilities will, in addition, be subject to court supervision via litigation against Charterholder brought by individuals affected by the actions of the charter school. The cost of this litigation can be substantial.

Notice: These are only a few of the charter school's legal responsibilities in this area, included here for illustrative purposes only.

12. Student Performance and Accountability. Charterholder shall satisfy Subchapters B, C, D, and G of Chapter 39 of the TEC, and related agency rules, as well as the student performance accountability criteria stated in its application for charter. Charterholder shall annually provide in a manner and form defined by the commissioner a written evaluation of the charter school's compliance with the statements, assurances,

TEA-0000204

commitments and representations made by Charterholder in its application for a charter, attachments, and related documents.

13.  Criminal History.  Charterholder shall take prompt and appropriate measures if Charterholder or the charter school, or any of their employees or agents, obtains information that an employee or volunteer of the charter school or an employee, officer, or board member of a management company contracting with the charter school has a reported criminal history that bears directly on the duties and responsibilities of the employee, volunteer, or management company at the school. Charterholder further represents that the Board and the agency shall be notified immediately of such information and the measures taken.

14.  Reporting Child Abuse or Neglect.  Charterholder shall adopt and disseminate to all charter school staff and volunteers a policy governing child abuse reports required by Chapter 261, Texas Family Code. The policy shall require that employees, volunteers or agents of Charterholder or the charter school report child abuse or neglect directly to an appropriate entity listed in Chapter 261, Texas Family Code.

15.  Notice to District.  Charterholder shall notify the school district in which the student resides within three business days of any action expelling or withdrawing a student from the charter school.

16.  School Year.  Charterholder shall adopt a school year with fixed beginning and ending dates.

## Financial Managment

17.  Fiscal Year.  Charterholder shall adopt a fiscal year beginning September 1 and ending August 31.

18.  Financial Accounting.  Unless otherwise notified by the agency, Charterholder shall comply fully with generally accepted accounting principles ("GAAP") and the Financial Accountability System Resource Guide, Bulletin 679 or its successor ("Bulletin 679") published by the agency in the management and operation of the charter school.

19.  Federal Requirements.  Failure to comply with Internal Revenue Service withholding regulations shall constitute a material violation of the charter.

20.  Workers' Compensation.  Charterholder shall extend workers' compensation benefits to charter school employees by (1) becoming a self-insurer; (2) providing insurance under a workers' compensation insurance policy; or (3) entering into an agreement with other entities providing for self-insurance.

21.  Annual Audit.  Charterholder shall at its own expense have the financial and programmatic operations of the charter school audited annually by a certified public accountant holding a permit from the Texas State Board of

109

**Appx. 007**

TEA-0000205

Public Accountancy. Charterholder shall file a copy of the annual audit report, approved by Charterholder, with the agency not later than the 120th day after the end of the fiscal year for which the audit was made. The audit must comply with Generally Accepted Auditing Standards and must include an audit of the accuracy of the fiscal information provided by the charter school through PEIMS. Financial statements in the audit must comply with Government Auditing Standards and the Office of Management and Budget Circular 133.

22. Attendance Accounting. To the extent required by the commissioner, Charterholder shall comply with the "Student Attendance Accounting Handbook" published by the Agency; provided, however, that Charterholder shall report attendance data to the agency at six-week intervals or as directed by the agency.

23. Foundation School Program. . Distribution of funds to the charter school under Section 12.106, TEC, is contingent upon charterholder's compliance with the terms of the charter. Charterholder is ineligible to receive Foundation School Program funds prior to execution of this contract by the board. Within 30 days of receiving notice of overallocation and request for refund under Section 42.258, TEC, Charterholder shall transmit to the agency an amount equal to the requested refund. If Charterholder fails to make the requested refund, the agency may recover the overallocation by any means permitted by law, including but not limited to the process set forth in Section 42.258, TEC.

24. Tuition and Fees. Charterholder shall not charge tuition and shall not charge a fee except that it may charge a fee listed in Subsection 11.158(a), TEC.

25. Assets of Charter. Charterholder shall not apply, hold, credit, transfer or otherwise make use of funds, assets or resources of the charter school for any purpose other than operation of the charter school described in the charter.

26. Indebtedness of Charter. Charterholder shall not incur a debt, secure an obligation, extend credit, or otherwise make use of the credit or assets of the charter school for any purpose other than operation of the charter school described in the charter.

27. Interested Transactions. All financial transactions between the charter school and (a) Charterholder; (b) an officer, director, or employee of Charterholder or of the charter school; or (c) a person or entity having partial or complete control over Charterholder or the charter school shall be separately and clearly reflected in the accounting, auditing, budgeting, reporting, and record keeping systems of the charter school. Charterholder shall not transfer any asset of the charter or incur any debt except in return for goods or services provided for the benefit of the charter school at fair market value.

**Appx. 008**

TEA-0000206

28. Non-Charter Activities. Charterholder shall keep separate and distinct accounting, auditing, budgeting, reporting, and record keeping systems for the management and operation of the charter school. Any business activities of Charterholder not directly related to the management and operation of the charter school shall be kept in separate and distinct accounting, auditing, budgeting, reporting, and record keeping systems from those reflecting activities under the charter. Any commingling of charter and non-charter business in these systems shall be a material violation of the charter.

### Governance and Operations

29. Non-Profit Status. Charterholder shall take and refrain from all acts necessary to be and remain in good standing as an organization exempt from taxation under Section 501(c)(3), Internal Revenue Code. If Charterholder is incorporated, it shall in addition comply with all applicable laws governing its corporate status. Failure to comply with this paragraph is a material violation of the charter, and the Board may act on the violation even if the Internal Revenue Service, Secretary of State, or other body with jurisdiction has failed to act.

30. Records Retention and Management. Charterholder shall implement a records management system that conforms to the system required of school districts under the Local Government Records Act, Section 201.001 et seq., Local Government Code, and rules adopted thereunder; provided, however, that records subject to audit shall be retained and available for audit for a period of not less than five (5) years from the latter of the date of termination or renewal of the charter.

31. PEIMS Reporting. Charterholder shall report timely and accurate information to the Public Education Information Management System (PEIMS), as required by the commissioner.

32. Conflict of Interest. Charterholder shall comply with any applicable prohibition, restriction or requirement relating to conflicts of interest. If an officer or board member of Charterholder or of the charter school has a substantial interest, within the meaning of Chapter 171, Local Government Code, in a transaction, such interest shall be disclosed in public session at a duly called meeting of the governing body prior to any action on the transaction.

33. Disclosure of Campaign Contributions. Charterholder shall adopt policies that will ensure compliance with the disclosure requirements of State Board of Education Operating Rule 4.3 or its successor.

34. Indemnification. Charterholder shall hold the Board and agency harmless from and shall indemnify the Board and agency against any and all claims, demands, and causes of action of whatever kind or nature asserted by any third party and occurring or in any way incident to, arising

**Appx. 009**

out of, or in connection with wrongful acts of Charterholder, its agents, employees, and subcontractors.

35. Failure to Operate. Charterholder shall operate the charter school for the full school term as described in the charter application in each year of the charter contract. Charterholder may not suspend operation for longer than 21 days without a revision to its charter, adopted by the Board, stating that the charter school is dormant and setting forth the date on which operations shall resume and any applicable conditions. Suspension of operations in violation of this paragraph shall constitute abandonment of this contract and of the charter.

36. Charter School Facility. Charterholder shall have and maintain throughout the term of the charter a lease agreement, title or other legal instrument granting to Charterholder the right to occupy and use one or more facilities suitable for use as the charter school facilities described by the charter. During any period of dormancy granted by the Board, this requirement may be waived by the Board. Facilities occupied and used as charter school facilities shall comply with all applicable laws, including, but not limited to, the Texas Architectural Barriers Act, Article 9102, Vernon's Texas Civil Statutes.

## Enforcement

37. Agency Investigations. The commissioner may in his sound discretion direct the agency to conduct investigations of the charter school to determine compliance with the terms of the charter or as authorized in Sections 39.074 and 39.075, Subchapter D, Chapter 39, TEC or other law. Charterholder, its employees and agents shall fully cooperate with such investigations. Failure to timely comply with reasonable requests for access to sites, personnel, documents or things is a material violation of the charter.

38. Commissioner Authority. The commissioner in his sole discretion may take any action authorized by Section 39.131, TEC or Chapter 29, TEC relating to the charter school. Such action is not "adverse action" as used in this contract. Charterholder, its employees and agents shall fully cooperate with such actions. Failure to timely comply with any action authorized by Section 39.131, TEC or Chapter 29, TEC is a material violation of the charter.

39. Adverse Action. The Board in its sole discretion may modify, place on probation, revoke or deny timely renewal of the charter for cause ("adverse action"). Each of the following shall be cause for adverse action on the charter: (a) any material violation of the terms of the charter listed in paragraphs 2, 3, and 20; (b) failure to satisfy generally accepted accounting standards of fiscal management; or (c) failure to comply with an applicable law or rule.

132

**Appx. 0010**

TEA-0000208

This Agreement

40. Entire Agreement. This contract, including all referenced attachments and terms incorporated by reference, contains the entire agreement of the parties. All prior representations, understandings and discussions are merged into, superseded by and canceled by this contract.

41. Severability. If any provision of this contract is determined by a court or other tribunal to be unenforceable or invalid for any reason, the remainder of the contract shall remain in full force and effect, so as to give effect to the intent of the parties to the extent valid and enforceable.

42. Conditions of Contract. Execution of this contract by the Board is conditioned on full and timely compliance by Charterholder with: (a) the terms, required assurances and conditions of Request for Application #701-97-028; (b) applicable law; and (c) all commitments and representations made in Charterholder's application and any supporting documents (to the extent such commitments and representations are consistent with the terms of this contract).

43. No Waiver of Breach. No assent, express or implied, to any breach of any of the covenants or agreements herein shall waive any succeeding or other breach.

44. Venue. Any suit arising under this contract shall be brought in Travis County, Texas.

45. Governing Law. In any suit arising under this contract, Texas law shall apply.

46. Authority. By executing this contract, Charterholder represents that it is an "eligible entity" within the meaning of Section 12.101 (a), TEC. Charterholder shall immediately notify the Board of any legal change in its status which would disqualify it from holding the charter, of any violation of the terms and conditions of this contract, or of any change in the chief operating officer of the charter school or Charterholder. Charterholder further represents that the person signing this contract has been properly delegated authority to do so.

Entered into this __28th__ day of __Sept.__, 1998.

Texas State Board of Education                    Charterholder

By Dr. Jack Christie                              Excellence 2000, Inc.
Chairman                                          By _____, Pres.

TAB 3:

PLAINTIFF'S 2016 LAWSUIT. 1 CR. 232-251

9/14/2016 2:56:45 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-16-003410
Nancy Rodriguez

CAUSE NO. D-1-GN-16-003410

| | | |
|---|---|---|
| EXCELLENCE 2000, INC. | § | IN THE DISTRICT COURT |
| d/b/a CHILDREN FIRST ACADEMY OF | § | |
| DALLAS CHARTER SCHOOL | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| V. | § | 53RD JUDICIAL DISTRICT |
| | § | |
| TEXAS EDUCATION AGENCY, and | § | |
| MIKE MORATH, | § | |
| COMMISSIONER OF EDUCATION | § | |
| FOR THE STATE OF TEXAS | § | |
| (in His Official Capacity) | § | |
| | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

**PLAINTIFF'S SECOND AMENDED PETITION AND
APPLICATION FOR TEMPORARY RESTRAINING ORDER,
TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**

TO THE HONORABLE JUDGE OF THIS COURT:

**COMES NOW** EXCELLENCE 2000, INC. d/b/a CHILDREN FIRST ACADEMY OF

DALLAS CHARTER SCHOOL, Plaintiff, which files this Second Amended Petition and

Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

against the Texas Education Agency and Mike Morath, Commissioner of Education for the State

of Texas, for deprivation of the Plaintiff's constitutionally protected rights in direct violation of

Texas law. Defendants, through their agents and representatives, have engaged in acts and

conduct with the intent to take, harm or destroy Plaintiff's constitutionally protected vested

property rights and business interests in violation of Art. 1 § 17 and Art. 1 § 19 of the Texas

Constitution. Plaintiff further alleges, and will subsequently prove, that the Defendant Morath,

in his official capacity as Commissioner of Education, has exceeded the scope of his legitimate

**Appx. 0013**

232

and lawful authority in violation of the Texas Constitution and the Texas Education Code.

Therefore, pursuant to § 37.001 et seq., TEXAS CIV. PRACTICE AND REMEDIES CODE, Plaintiff seeks a declaratory judgment under the Texas Uniform Declaratory Judgments Act to declare the relative rights, duties and responsibilities of the parties, and to further declare that Defendants, through the actions of their employees and agents, have violated the Texas Constitution. Plaintiff also seeks a declaratory judgment pursuant to Sec. 2001.038, TEXAS GOV'T. CODE, to determine the legality and validity of certain agency rules, regulations, administrative procedures and informal agency interpretations adopted by Defendants to unlawfully interfere with the business interests of Plaintiff and to forcibly seize the property and assets of Plaintiff. Said rules, agency directives, and policy interpretations have interfered with or impaired, or are threatening to interfere with and substantially impair, the legal rights and privileges of the Plaintiff.

Finally, Plaintiff seeks temporary and permanent injunctive relief to protect Plaintiff from suffering further destruction of its assets and property interests by the oppressive conduct of Defendants and their employees and surrogates.

In support thereof, Plaintiff EXCELLENCE 2000, INC. will respectfully show:

## I.

## DISCOVERY CONTROL PLAN

1.    Pursuant to Rule 190, Texas Rules of Civil Procedure, Plaintiff asserts that discovery should be conducted under Rule 190.3 (Level 2) as Plaintiff seeks only injunctive and declaratory relief.

## II.

## PARTIES

2.      Plaintiff, Excellence 2000, Inc. d/b/a Children First Academy of Dallas Charter School ("Excellence") is a private non-profit and tax-exempt corporation organized under Sec. 501(c)(3), U. S. Internal Revenue Code, 26 U.S.C. § 501(c)(3). At all times relevant to this law suit Excellence was authorized to conduct business in the State of Texas as a non-profit corporation. Excellence is managed by a Board of Directors and its corporate administrative offices are headquartered at 7803 Little York Road, Houston, Texas 77016.

3.      Defendant, Texas Education Agency ("TEA" or "The Agency"), is a state agency charged with administrative responsibility for implementing and administering various state statutes governing open-enrollment public charter schools in the State of Texas. Defendant TEA may be served with process by serving Ken Paxton, Attorney General for the State of Texas, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548.

4.      Defendant, Mike Morath, ("Commissioner") is being sued only in his official capacity as the Commissioner of Education for the State of Texas. Commissioner Morath is authorized under state law with certain limited powers including the power to develop and implement reasonable rules, regulations, and policies to execute Texas statutes and laws governing open-enrollment charter schools and public education. Defendant Morath may be served with process by serving Ken Paxton, Attorney General for the State of Texas, P. O. Box 12548, Capitol Station, Austin, Texas 78711-2548.

5.      Pursuant to Sec. 30.004, TEX. CIV. PRACTICE AND REMEDIES CODE, a copy of this petition has been sent by certified mail, return receipt requested to Ken Paxton, Attorney General for the State of Texas, P. O. Box 12548, Capitol Station, Austin, Texas 78701.

**Appx. 0015**

234

## III.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over the Defendants and the matters in controversy because Plaintiff seeks declaratory and injunctive relief against Defendants for violations of the Texas Education Code and the Texas Constitution.

7.     Venue is proper in Travis County, Texas because Defendants are agencies or representatives of government of the State of Texas.

## IV.

## FACTUAL BACKGROUND

8.     In 1995, the Texas Legislature gave legislative impetus to the creation of open-enrollment public charter schools.  Open-enrollment charter schools are now firmly established public schools in the State of Texas.  In 2014-15 there were approximately 228,000 students in 613 charter campuses run by 195 charter holders across the State of Texas, and more than 105,000 students on waiting lists to attend a public charter school.

9.     Plaintiff, Excellence 2000, Inc., is a non-profit tax exempt charitable corporation under Section 501(c)(3) of the U. S. Internal Revenue Code, and a privately run corporate entity authorized to conduct business in the State of Texas.  As a private, non-profit business entity, Excellence conducts and transacts business, enters into contracts, incurs debts, secures services, purchases property, pays taxes and generally enjoys the same rights, privileges and immunities of any other business entity that operates in the State of Texas.

10.     In October, 1997, Excellence executed two charter contracts with the Texas State Board of Education to open and operate two new charter schools:  Children First Academy of Dallas and Children First Academy of Houston (collectively "CFA" or "Children First").  The Children

First Academy of Dallas opened in November, 1997. The Children First Academy of Houston opened in January, 1998. The charter was subsequently renewed in September, 2004.

11.     Thus, for almost 19 years, Children First has generally provided exceptional educational services to approximately 800 low-income pre-K through 7th grade students and families at campuses in Houston and Dallas, Texas. 94% of the students were African-American, 5% Hispanic and 1% Caucasian. Over 95% of these students came from low-income and economically disadvantaged households.

12.     The charter school district was launched with a priority focus on serving the needs of "disadvantaged students who are performing academically one to three years below grade level and are not experiencing success in public schools."

13.     In 2000, Excellence 2000, Inc. purchased land for a permanent Houston campus. The purchase price for the land was about $800,000. $145,000 was paid using private funds, and state funds were used to pay the remaining balance of about $565,000.00. After purchasing the land in 2000, in 2003 Excellence purchased the two school buildings situated on the land at a total contract price of $810,000. This property is located at 7803 Little York Road in Houston, Texas and it currently serves as the central business office of Excellence 2000, Inc., as well as the district central administrative offices of the Children First Academy Charter School District. Virtually all important corporate, business, financial, personnel, and governmental records are maintained and kept at the Houston location.

14.     In 2009, the Dallas campus was built for approximately $3.2 million dollars. The Dallas campus is located at 315 E. Wheatland Drive, Dallas, Texas, and since the campus was built, Excellence 2000, Inc. has operated a charter school at that location. This location also contains

critically important business and financial records pertaining to the operations of the charter school and Excellence 2000, Inc.

15. During the 19 years of the charter school's existence, Excellence entered into hundreds of contractual commitments and legal obligations. This includes hundreds of vendor agreements, contracts for professional services, contracts with federal and state governmental entities, and contracts with banking and financial institutions. Excellence paid property taxes and withheld employee income taxes, and provided employee benefit packages. The corporation also incurred millions of dollars in debts, bank loans, short and long-term leases of assets and equipment, and other financial transactions through contractual obligations.

16. Aside from purchasing the real property noted above, Excellence acquired millions of dollars in tangible personal property, durable goods, fixtures, and other assets that encompassed a broad array of business and financial dealings and investments all consummated for the purpose of operating the charter schools. For example, in May, 2015, Excellence borrowed $1,000,000 from the Bank of Madisonville at an annual interest rate of 2.3%. The loan has a term of 24 monthly payments of $42,672 with a maturity date of May 12, 2017. The loan is secured by Certificate of Deposit and savings accounts belonging to Excellence 2000. This debt remains due and payable; as of August 31, 2016, the total amount of the outstanding debt was about $349,000.

### Closure of the School

17. Despite a strong record of producing remarkable academic gains among its students, Excellence's application to renew the charter contract was denied by the Commissioner of Education. By letter dated March 11, 2016, the Commissioner of Education gave final notice that the charter contract executed for Children First Academy would expire on July 31, 2016 and

**Appx. 0018**

**237**

not be renewed on the grounds that CFA had been assigned negative financial accountability ratings for 2010-2011, 2011-2012 and 2014-2015 school years. Thus, on July 31st, the charter school district was involuntarily closed and all educational services terminated.

18.    Thereafter, in anticipation of the charter school district's imminent closure, and almost immediately after this decision was announced, the TEA-appointed Conservator, Dr. Bobby Parker, began issuing numerous legally questionable directives many of which had totally unreasonable and unworkable deadlines to complete. These directives included, among other things, his refusal to grant authorization to pay employees, refusal to pay for a final close-out audit, refusal to honor contractual commitments and a demand for immediate cancellation of all contracts, leases, and vendor agreements regardless of the cost or potential legal exposure. The Excellence, 2000, Inc. Board was directed to executed deeds to the property in favor of the Texas Education Agency and to turn over all keys to the buildings, vehicles, and other similar property.

19.    Excellence and CFA staff considered many of the directives unreasonable or issued in direct violation of Texas law. They were therefore resisted. On August 16th, the Commissioner appointed a two-person "Board of Managers" to replace the Excellence 2000, Inc. Board of Directors in managing Children First Academy and the close-out activities related to it. Excellence staff appealed this decision. The appeal was denied by Defendant Commissioner who also denied Excellence an opportunity for a hearing.

20.    With the appointment of the TEA-Board of Managers, the Excellence 2000, Inc. Board was stripped of all power and authority over its business operations, finances, personnel, and governance. This meant that the TEA-Board of Managers now has almost unlimited power to direct and control the affairs of not only Children First Academy, but also of Excellence 2000, Inc. a private non-profit corporation. This includes almost complete and unbridled discretion to

**Appx. 0019**

238

make decisions detrimental and contrary to the business and financial interests of Excellence 2000, Inc. As a result, without any right of appeal or administrative review, Plaintiff Excellence Board no longer has any meaningful autonomy, control, or power over the management and operations of Excellence 2000, Inc. as they pertain to Children First Academy Charter School District.

21. On September 7th, the TEA-Management Team convened a public meeting via teleconference call at the CFA Dallas campus. The purpose of the meeting was in part to officially install James Holman and Carol Francois as the new "Board" with the power and authority to direct all activities of CFA with respect to close-out of the charter's operations. Dr. Bobby Parker was appointed by the Management Team to serve as "superintendent".

22. During the course of the meeting, the TEA-Board of Managers voted unanimously to cancel all legally binding contracts entered into by Excellence 2000, Inc. without any apparent consideration for the potential adverse legal consequences to Plaintiff who could face future law suits for breach of contract and other legal claims. They also voted unanimously to stop delivery of all mail properly belonging to Excellence, 2000, Inc. This includes billing statements, invoices, and important personal and business mail addressed to individual employees and staff.

23. On September 2nd, the locks to all of the doors at the Dallas campus building were changed by order of TEA staff, thus unlawfully depriving Excellence staff to its property and access to important business, financial and personnel records. The TEA-Board of Managers also voted unanimously to seize control over all funds and monies currently on deposit in all bank accounts and financial institutions owned by Plaintiff – regardless of the source of the funds – and regardless if to do so would deprive Plaintiff of critical funds to meet its contractual commitments, pay debts and other financial obligations incurred as a direct result of operating

the charter school. This would include seizure of the Certificate of Deposit and savings accounts that are encumbered for repayment of the $1,000,000 loan borrowed from Bank of Madisonville.

24. Dr. Parker has persisted in demanding that Excellence 2000, Inc. execute deeds to both the Dallas and Houston properties to TEA claiming the buildings are now "owned" by TEA in spite of TEA adopted regulations that requires the commissioner to return to the former charter holder any property in excess of the ownership interests of the State of Texas. [See: 19 Tex. Admin. Code § 100.1067(c)(5)].

25. In summary, Defendants, through their agents and representatives, have engaged in a systematic and orchestrated plan to damage or destroy Plaintiff's vested property rights, legitimate business interests, and financial well-being. (See attached Exhibit "A", Affidavit of Dr. Sherwin Allen)

## V.

## REQUEST FOR DECLARATORY RELIEF

26. Plaintiff incorporates the allegations in paragraphs 1 to 25 by reference as if they are set forth in their entirety below. There exists a genuine controversy between the parties herein that would be terminated by the granting of declaratory judgment. Jurisdiction of this court is proper under the Uniform Declaratory Judgments Act (UDJA), § 37.001 et seq., TEXAS CIV. PRACTICE AND REMEDIES CODE. Plaintiff requests declaratory relief under the UDJA because plaintiff seeks a judicial declaration of its rights under Texas law on the following grounds:

## VIOLATION OF ART. 1, § 19 OF THE TEXAS CONSTITUTION

27. Pursuant to Art. 1, § 19 of the Texas Constitution, no citizen of the State shall be deprived of his or her property except by due course of law. Plaintiff has a vested property interest in its contracts, leases, and promissory notes with its creditors and debtors. Plaintiff also

has a vested property interest in its business and financial records, personnel files, and personal property not acquired or purchased with state funds. Defendant Texas Education Agency has exceeded the scope of its legitimate and lawful authority by ordering the wholesale cancellation of all contracts, seizing plaintiff's mail, business records, and employee personnel files among others, depriving Plaintiff unfettered access to its business records, and seizing its bank accounts without any opportunity for Plaintiff to challenge or contest these actions. Plaintiff seeks a declaratory judgment from the Court to declare that said actions constituted a violation of Plaintiff's rights under Art. 1, § 9 of the Texas Constitution.

## § 12.128, TEX. EDUC. CODE, AS
## APPLIED TO PLAINTIFF IS UNCONSTITUTIONAL
## IN VIOLATION OF ART. 1, SEC. 17 OF THE TEXAS CONSTITUION

28.    Art. 1, Sec. 17 of the Texas Constitution prohibits the taking, damaging or destruction of private property for public use without just compensation. § 12.128(a), Tex. Educ. Code, expressly provides that property purchased or leased with state funds after September 1, 2001, is deemed to be public property. Subsection (c) directs the commissioner of education "to take possession and assume control of the public property of an open-enrollment charter school that ceases to operate and supervise the disposition of the property "in accordance with law". Defendants have misinterpreted or misapplied this statutory scheme to justify the wholesale taking and seizure of all of Plaintiff's property and assets and the cancellation of its contracts, leases, debts, and bank accounts. In accordance with Texas law, Plaintiff has a vested property interest in its deeds and the equity value of its real property which is in excess of the amount of state funds used to purchase the lease the property. By seizing virtually all of Plaintiff's property and assets and declaring them to be solely the public property of the State of Texas without just

**Appx. 0022**

241

compensation, Defendant Texas Education Agency's actions clearly have not been done "in accordance to law" and are unconstitutional in violation of Art. 1, § 17 of the Texas Constitution as a matter of law. Plaintiff therefore seeks a declaration that Defendant's conduct has violated the constitutional rights of Plaintiff.

## VI.

## VIOLATION OF THE TEXAS OPEN MEETINGS ACT

29.     Plaintiff incorporates the allegations in above paragraphs as if they are set forth in their entirety below. The TEA-appointed two-person Board of Managers convened an open meeting at the CFA Dallas campus. James Holman, a member of this board, was not physically present during the meeting. Instead he participated by telephone conference call from Houston. § 551.125(b), Tex. Gov't. Code, expressly prohibits a governmental meeting held by telephone conference call except when "an emergency or public necessity exists within the meaning of § 551.045 of this chapter". § 551.045 defines an "emergency" or "urgent public necessity" to exist "only if immediate action is required of a governmental body because of (1) an imminent threat to public health and safety; or (2) a reasonably unforeseeable situation." On its face the meeting was unlawful and held in direct violation of the Texas Open Meetings Act because it was not convened to respond to an imminent threat to public safety. Pursuant to §§ Sec. 551.141 and 551.142, Tex. Govt. Code, Plaintiff therefore seeks a judicial declaration declaring the meeting void, and an injunction to reverse any decision and action taken during the course of the unlawful meeting.

## VII.

## DEFENDANT COMMISSIONER OF EDUCATION
## ACTIONS ARE OUTSIDE THE SCOPE OF HIS AUTHORITY

30.     Plaintiff incorporates the allegations in the above paragraphs as if they are set forth in

**Appx. 0023**

242

their entirety below. Defendant Mike Morath is a state public official. Under Texas law, a government official only has such authority that has been granted by the Constitution and Texas Legislature. This suit is being brought against Commissioner Morath in his official capacity because he has acted beyond the scope of his legitimate authority under Texas law by his failure to adopt appropriate rules and regulations to implement Sec. 12.128, Tex. Educ. Code, for closing-out a charter school "in accordance with Texas law".

31. In particular, Plaintiff seeks a declaratory judgment under § 2001.038, TEXAS GOV'T. CODE. The Texas Administrative Procedure Act, Chapter 2001, TEXAS GOV'T. CODE ("APA") sets forth very specific requirements for state agencies in developing and promulgating rules of general applicability that are designed to implement, interpret, or enforce a statute or policy. The Act requires state agencies, among other things, to give at least 30 days notice of its intent to adopt a rule, file said notice with the Secretary of State for publication in the Texas Register, with a brief explanation for the rule, the statutory authority under which the agency is acting, a certification by the agency that the rule has been reviewed by the agency's legal counsel, various fiscal notes, reasonable opportunity for public comment – including a public hearing, formal adoption of the rule by the agency, and so on.

32. Defendant has failed to promulgate a coherent set of regulations for closing out the affairs of a charter school without trampling on the rights of the former charter holder. Defendants have promulgated no substantive rules or agency interpretations designed to provide a concise set of uniform standards to guide TEA employees and agents when winding down the affairs of a closed charter school. As a result, TEA employees engage in ad hoc, arbitrary decision-making resulting in violations of Texas law and the constitutional rights of former charter holders like Plaintiff. Instead of instituting and following formal rule-making procedures as required under

**Appx. 0024**

243

the APA, with opportunities for citizen input and collaboration between the agency and charter school operators, Defendants have opted to rely upon an arbitrary pronouncements to the harm and detriment to Plaintiff and other former charter holders.

33.     The Defendants have imposed administrative rules and regulations that are inconsistent with, and contrary to, the governing statute in violation of their legitimate statutory authority. The failure of Defendants to adopt and publish appropriate agency rules for an orderly transition and winding down the affairs of a closed charter school is a direct violation of the governing statute, and therefore unconstitutional. Said unlawful conduct creates a cause of action against Defendants for the deprivation of Plaintiff's constitutionally protected due process rights under Texas law.

## VIII.

## <u>APPLICATION FOR INJUNCTIVE RELIEF</u>

34.     Plaintiff incorporates the allegations in the above paragraphs as if they are set forth in their entirety below. In light of the above facts, the violations of Plaintiff's rights under the Texas Constitution, the likelihood of Plaintiff's success on the merits, and the immediate and imminent harm that Excellence will suffer in the absence of this Court's protection, Excellence seeks a Temporary Restraining Order and Temporary Injunction pursuant to Sec. 65.011, Tex. Civil Practice and Remedies Code. Injunctive relief is essential to prevent imminent harm to Plaintiff and to temporarily and permanently enjoin the Defendants, their employees, agents and authorized representatives, from causing irreparable injury to Plaintiff and to its business, financial and property interests. Every day that this unlawful use continues, the greater the harm to Plaintiff. Such unlawful actions by Defendants will destroy Plaintiff's valuable business relationships causing irreparable harm to Plaintiff. Money damages are not an adequate remedy

**Appx. 0025**

244

to protect Plaintiff's proprietary business relationships, and damages could never fully compensate Plaintiff for the losses that could be suffered even during the pendency of this case. Plaintiff therefore seeks only prospective, injunctive relief.

35. As part and parcel of this request, Excellence seeks to temporarily halt all activities of the assigned TEA-appointed Board of Managers and superintendent from (1) damaging, destroying, altering, disrupting, or unlawfully interfering with the property, assets, business records, bank accounts, mail, contracts, employees, and affairs of Plaintiff 2000, Inc. its administration and Board of Directors, (2) seizing assets, property and funds of Plaintiff and (3) otherwise interfering with the financial, business and contractual obligations and property of Excellence pending further order of this Court and/or a final resolution of the matters and issues in controversy.

36. Unless the Court enters a temporary restraining order and a temporary injunction, granting relief as sought by Plaintiff in the same form as sought by the permanent injunction described below during the pendency of this action, Excellence will suffer immediate and irreparable injury and harm. Plaintiff has been placed in jeopardy of being deprived of a substantial part of the benefits it should derive from the development of its lawful business operations and contractual commitments for which Plaintiff has expended large sums of money. Unless restrained by this Court, Defendant Commissioner, and those acting in privity with him, will continue to jeopardize and substantially injure Plaintiffs' business and financial interests.

37. Excellence seeks a permanent injunction restraining and enjoining Defendant Commissioner, his employees, attorneys, and agents, and those persons in active concert or participation with any of them, individually or collectively, from taking any action of any character or nature having the purpose or effect of directing or managing Plaintiff's operations.

38.    The irreparable injury threatened to Excellence's business and contractual relations by the actions of Defendants warrant the granting of injunctive relief.  It is further alleged, if necessary, that Excellence has no adequate remedy at law other than the injunctive relief prayed for to prevent the destruction of its existing and prospective customer relations and business income.

## PRAYER

Plaintiff, Excellence 2000, Inc. respectfully prays that the Court take jurisdiction of this case, that Defendants Texas Education Agency and Commissioner of Education Mike Morath be cited to answer and appear; and that upon final consideration Plaintiff be awarded the temporary injunctive and permanent injunctive relief described above, declaratory relief as requested, costs and attorney fees as permitted under § 37.009, TEXAS CIV. PRACTICE AND REMEDIES CODE, and Sec. 2001.038, TEXAS GOV'T. CODE, grant such other and further relief, general and special, at law or in equity, to which the Plaintiff may show itself justly entitled.

RESPECTFULLY SUBMITTED,

LAW OFFICES OF K. RANDOLPH EVANS,
P. O. BOX 142534
Austin, Texas  78714-2534
OFFICE:      (512)926-0091
FAX:          (512)926-0092
Kelevans@aol.com


By:      /s/ *K. R. Evans*

K. R. EVANS
State Bar No.  06723620

ATTORNEY FOR PLAINTIFF
EXCELLENCE 2000, INC.

| | | |
|---|---|---|
| EXCELLENCE 2000, INC. | § | IN THE DISTRICT COURT |
| d/b/a CHILDREN FIRST ACADEMY | § | |
| OF DALLAS CHARTER SCHOOL | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| V. | § | 53RD JUDICIAL DISTRICT |
| | § | |
| TEXAS EDUCATION AGENCY, and | § | |
| MIKE MORATH, | § | |
| COMMISSIONER OF EDUCATION | § | |
| FOR THE STATE OF TEXAS | § | |
| (in His Official Capacity) | § | |
| | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

## AFFIDAVIT OF DR. SHERWIN A. ALLEN

**State of Texas** §

**County of Harris** §

BEFORE ME, the undersigned Notary Public, personally appeared Dr. Sherwin Allen, who, being by me duly sworn on oath deposed and said that he has read this affidavit; and that every statement contained in this affidavit is within his personal knowledge and is true and correct.

"My name is Dr. Sherwin Allen. I am over the age of eighteen (18) years and there is no legal impediment to my making this Affidavit.

"I have been a professional educator for over 50 years. I have served in a variety of educational positions including as a teacher, Assistant Principal, Principal, Assistant Superintendent and Superintendent.

"In 1964, I launched my teaching career as the band director at J. D. Wallace High

School, an all-Black High School in then racially segregated Fordyce Public School District in Fordyce, Arkansas. Since that time I have been a fierce opponent of unequal educational opportunities and, and I have dedicated my life to equal educational opportunities to all students regardless of race, color or ethnicity.

"I served as the Superintendent of Children First Academy of Dallas until August of this year, when I was involuntarily replaced by the Commissioner of Education. Children First Academy ("CFA") is a charter school district which, until July of this year, provided educational services to at-risk public school students who live in Dallas and Houston.

"I also serve as the President of the Board of Directors for Excellence 2000, Inc., ("Excellence") a non-profit charitable corporation. In 1997, almost 19 years ago, Excellence executed a charter contract with the Texas Board of Education to own and operate CFA. As a private, non-profit corporation Excellence is authorized under the laws of the State of Texas and Section 501(c)(3) of the U. S. Internal Revenue Code to conduct and transact business in the State of Texas. Excellence 2000, Inc. is a distinct legal entity, with substantial business and financial interests separate and apart from those of the public charter school.

"On Wednesday, September 7, 2016, I attended a public meeting convened by the TEA-appointed Board of Managers. The Commissioner appointed this Board to take over management of CFA and to effectively seize control of the affairs of Excellence 2000, Inc. related to winding down the affairs and operations of the charter school district. The meeting was called to discuss and take action on various issues concerning Excellence and CFA.

"The individuals who convened the meeting were Dr. Bobby Parker, the Commissioner-appointed Superintendent of Children First Academy, and Carol Francois and James Holman appointed as the governing Board of Managers. These individuals were appointed by the Commissioner of Education and work under contracts as agents and representatives of TEA. During the course of this meeting, the Board made decisions and took actions that I believe if

Page 2

**Appx. 0029**

248  Exhibit A

left to stand will cause irreparable harm to the legitimate business and financial interests of Excellence 2000, Inc. and its employees and board members.

"The Board of Managers voted unanimously to cancel all legally binding contracts entered into by Excellence 2000, Inc. They took this measure over the outcry and expressed opposition of Excellence 2000, Inc. staff who complained that taking such an action is reckless and could expose Excellence 2000, Inc., its board members, and several individuals to civil law suits and imminent legal exposure for breach of contract and other legal claims. If this decision is allowed to stand, Excellence 2000, its employees and Board members could face catastrophic financial consequences as a direct result of this decision.

"Dr. Parker and the Management Team Board refused to listen, and in fact, refused to allow any input into the decision. They were completely impervious to the potential legal consequences of wholesale cancellation of our contractual commitments which was done without any serious consideration to our contractual duties and obligations and the detrimental impact such an action may create.

"Last week the locks to all of the doors at the Dallas campus building were changed by order of TEA staff. This was done to deprive us our right to legitimate access to our important and critical business records, personal property and other contents in the building. If these TEA appointed individuals are allowed to change the locks to the Houston buildings, we will be denied access to all of our most important business, financial and personnel records without any accountability for those records.

"The Board voted unanimously to seize control over all funds and monies currently on deposit in all bank accounts and financial institutions – regardless of the source of the funds – and regardless of our on-going contractual commitments to pay debts and other financial obligations incurred as a direct result of operating the charter school. If TEA is successful in transferring all of the funds out of our bank account, there is no question it will cause extreme

Page 3

**Appx. 0030**

249   Exhibit A

and irreparable financial harm to Excellence 2000, Inc. because the corporation will have no money whatsoever to pay our outstanding debts and to meet our other legal and contractual obligations that were legitimately and rightfully incurred from operating the charter school.

"Dr. Parker has persisted in demanding that Excellence 2000, Inc. execute deeds to both the Dallas and Houston properties to TEA claiming the buildings are now "owned" by TEA. He has made this demand without any consideration of Texas law which governs the handling of real property owned by a former charter school, without any consideration to the fair market value of the properties, the date of acquisition of the Houston property, and actual ownership interest of the State of Texas. The Houston property was purchased prior to September 1, 2001, and partially paid for with non-public funds.

"The Board of Managers voted unanimously to request the post office stop delivery of all mail properly belonging to Excellence, 2000, Inc. They took this action without citing any legal authorization whatsoever and without instituting appropriate safeguards to account for and protect the mail and without any mechanism for delivery of the mail to Excellence, 2000. This includes billing statements, invoices, and important personal and business mail addressed to individual employees and staff.

"These actions were taken over the strong objection and opposition of the former CFA staff whose protests were completely ignored and who were denied the opportunity to provide any meaningful input or communications during the meeting. I believe this reflects an on-going attempt by the Texas Education Agency to trample on our rights and to completely destroy our organization."

**Appx. 0031**

250   Exhibit A

SIGNED ON the __14__ day of September, 2016.

_M. Sherwin Allen_
DR. SHERWIN A. ALLEN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, by DR. SHERWIN ALLEN on this __14__ day of September, 2016, to certify which witness my hand and seal of office.

Notary Public in and for the
State of Texas



NINNA DESCHAUMES RAIN
Notary Public, State of Texas
Comm. Expires 02-01-2020
Notary ID 130519260

14-SEP-2016 08:39   From:71349191735

Page:7/7

Tab 4:

Tex. Educ. Code §12.107

Appx. 0033

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
    Education Code (Refs & Annos)
        Title 2. Public Education (Refs & Annos)
            Subtitle C. Local Organization and Governance
                Chapter 12. Charters (Refs & Annos)
                    Subchapter D. Open-Enrollment Charter School (Refs & Annos)

V.T.C.A., Education Code § 12.107

§ 12.107. Status and Use of Funds

Currentness

(a) Funds received under Section 12.106 after September 1, 2001, by a charter holder:

(1) are considered to be public funds for all purposes under state law;

(2) are held in trust by the charter holder for the benefit of the students of the open-enrollment charter school;

(3) may be used only for a purpose for which a school may use local funds under Section 45.105(c);

(4) pending their use, must be deposited into a bank, as defined by Section 45.201, with which the charter holder has entered into a depository contract; and

(5) may not:

(A) be pledged or used to secure loans or bonds for any other organization, including a non-charter operation or out-of-state operation conducted by the charter holder or a related party, as defined by commissioner rule adopted under Section 12.1166; or

(B) be used to support an operation or activity not related to the educational activities of the charter holder.

**Appx. 0034**

(b) A charter holder shall deliver to the agency a copy of the depository contract between the charter holder and any bank into which state funds are deposited.

**Credits**

Added by Acts 1995, 74th Leg., ch. 260, § 1, eff. May 30, 1995. Amended by Acts 2001, 77th Leg., ch. 1504, § 7, eff. Sept. 1, 2001. Amended by Acts 2019, 86th Leg., ch. 631 (S.B. 1454), § 4, eff. June 10, 2019.

Notes of Decisions (1)

V. T. C. A., Education Code § 12.107, TX EDUC § 12.107
Current through the end of the 2025 Regular and First Called Sessions of the 89th Legislature.

   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TAB 5:

TEX. EDUC. CODE §12.128

Vernon's Texas Statutes and Codes Annotated

Education Code (Refs & Annos)

Title 2. Public Education (Refs & Annos)

Subtitle C. Local Organization and Governance

Chapter 12. Charters (Refs & Annos)

Subchapter D. Open-Enrollment Charter School (Refs & Annos)

V.T.C.A., Education Code § 12.128

§ 12.128. Property Purchased or Leased with State Funds

Currentness

(a) Property purchased with funds received by a charter holder under Section 12.106 :

(1) is considered to be public property for all purposes under state law;

(2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school;

(3) may be used only for a purpose for which a school district may use school district property; and

(4) is exempt from ad valorem taxation as provided by Section 11.11, Tax Code.

(a-1) Property leased with funds received by a charter holder under Section 12.106 :

(1) is considered to be public property for all purposes under state law;

(2) is property of this state held in trust by the charter holder for the benefit of the students of the open-enrollment charter school;

(3) may be used only for a purpose for which a school district may use school district property; and

**Appx. 0037**

(4) is exempt from ad valorem taxation as provided by Section 11.11, Tax Code.

(a-2) The owner of property that receives a tax exemption under Subsection (a) shall transfer the amount of tax savings from the exemption to the tenant or reduce the common area maintenance fee in a proportionate amount based upon the square footage of the exempt portion of the property.

(b) If at least 50 percent of the funds used by a charter holder to purchase real property are funds received under Section 12.106 before September 1, 2001, the property is considered to be public property to the extent it was purchased with those funds.

(b-1) Subject to Subsection (b-2), while an open-enrollment charter school is in operation, the charter holder holds title to any property described by Subsection (a) or (b) and may exercise complete control over the property as permitted under the law.

(b-2) A charter holder may not transfer, sell, or otherwise dispose of any property described by this section without the prior written consent of the agency if:

(1) the charter holder has received notice of:

(A) the expiration of the charter holder's charter under Section 12.1141 and the charter has not been renewed; or

(B) the charter's revocation under Section 12.115(c);

(2) the charter holder has received notice that the open-enrollment charter school is under discretionary review by the commissioner, which may result in the revocation of the charter or a reconstitution of the governing body of the charter holder under Section 12.115; or

(3) the open-enrollment charter school for which the charter is held has otherwise ceased to operate.

(c) The commissioner shall:

(1) take possession and assume control of the property described by Subsection (a) of an open-enrollment charter school

that ceases to operate; and

(2) supervise the disposition of the property in accordance with this subchapter.

(c-1) Notwithstanding Subsection (c), if an open-enrollment charter school ceases to operate, the agency:

(1) for property purchased with state funds, shall direct the charter holder to dispose of the property through one of the following methods:

(A) retain or liquidate the property and provide reimbursement to the state as provided by Section 12.1281;

(B) transfer the property to:

(i) the agency under Section 12.1281(h); or

(ii) a school district or open-enrollment charter school under Section 12.1282;

(C) close the operations of the open-enrollment charter school under Section 12.1284; or

(D) take any combination of the actions described by Paragraphs (A), (B), and (C); and

(2) for property leased with state funds, may direct the charter holder to assign the charter holder's interest in the lease to the agency.

(c-2) The agency may approve an expenditure of remaining funds by a former charter holder for insurance or utilities for or maintenance, repairs, or improvements to property described by this section if the agency determines that the expenditure is reasonably necessary to dispose of the property or preserve the property's value.

(d) The commissioner may adopt rules necessary to administer this section.

(e) This section does not affect a security interest in or lien on property established by a creditor in compliance with law if the security interest or lien arose in connection with the sale or lease of the property to the charter holder.

(f) A decision by the agency under this section is final and may not be appealed.

**Credits**

Added by Acts 2001, 77th Leg., ch. 1504, § 18, eff. Sept. 1, 2001. Amended by Acts 2013, 83rd Leg., ch. 1140 (S.B. 2), § 37, eff. Sept. 1, 2013; Acts 2019, 86th Leg., ch. 631 (S.B. 1454), § 7, eff. June 10, 2019; Acts 2021, 87th Leg., ch. 916 (H.B. 3610), §§ 2, 3, eff. Sept. 1, 2021.

Notes of Decisions (15)

V. T. C. A., Education Code § 12.128, TX EDUC § 12.128
Current through the end of the 2025 Regular and First Called Sessions of the 89th Legislature.

TAB 6:

TEX. EDUC. CODE §12.1281

Vernon's Texas Statutes and Codes Annotated

Education Code (Refs & Annos)

Title 2. Public Education (Refs & Annos)

Subtitle C. Local Organization and Governance

Chapter 12. Charters (Refs & Annos)

Subchapter D. Open-Enrollment Charter School (Refs & Annos)

V.T.C.A., Education Code § 12.1281

§ 12.1281. Disposition of Property Purchased With State Funds

Currentness

(a) A former charter holder of an open-enrollment charter school that has ceased to operate may retain property described by Section 12.128 if the former charter holder reimburses the state with non-state funds and the former charter holder:

(1) provides written assurance that the requirements of Section 12.1284 will be met; and

(2) receives approval from the agency.

(b) On receiving consent from the agency under Section 12.128(b-2) and a written agreement from any creditor with a security interest described by Section 12.128(e), the former charter holder may:

(1) sell property for fair market value; or

(2) transfer property to an open-enrollment charter school or a school district as provided under Section 12.1282.

(c) The amount of funds the state is entitled to as reimbursement for property of a former charter holder is:

(1) for property retained by the former charter holder, the current fair market value less the amount of any debt subject to a security interest or lien described by Section 12.128(e), multiplied by the percentage of state funds used to purchase the property; or

(2) for property sold by the former charter holder, the net sales proceeds of the property multiplied by the percentage of state funds used to purchase the property.

(d) To determine the amount of state funds a former charter holder used to purchase property, the agency shall calculate:

(1) an estimated state reimbursement amount based on the last annual financial report filed under Section 44.008 available at the time the former charter holder retains or sells the property; and

(2) a final state reimbursement amount using the former charter holder's final financial audit filed under Section 44.008.

(e) A former charter holder retaining property under Subsection (a) or selling the property under Subsection (b)(1) shall:

(1) file an affidavit in the real property records of the county in which the property is located disclosing the state interest in the property;

(2) place in escrow with the state comptroller an amount of non-state funds equal to 110 percent of the estimated state reimbursement amount not later than:

(A) the closing date of the sale of the property if the charter holder is selling the property; or

(B) the 90th day after the charter school's last day of instruction if the charter holder is retaining the property; and

(3) not later than two weeks after the date the charter holder's final financial audit is filed under Section 44.008, submit to the state the final state reimbursement amount using the funds in escrow in addition to any other funds necessary to pay the full amount of state reimbursement.

(f) A former charter holder may retain any funds remaining after complying with this section.

(g) As soon as the agency is satisfied that the former charter holder complied with Subsection (e), the agency shall file written notice of the release of the state interest in property the former charter holder retains under this section and authorize the return of any funds not used for state reimbursement to the former charter holder.

(h) Subject to the satisfaction of any security interest or lien described by Section 12.128(e), if a former charter holder does not dispose of property under Subsection (a) or (b), the former charter holder shall transfer the property, including a conveyance of title, to the agency in accordance with the procedures and time requirements established by the agency.

(i) Subject to the satisfaction of any security interest or lien described by Section 12.128(e), if the agency determines a former charter holder failed to comply with this section or Section 12.1282, on request of the agency, the attorney general shall take any appropriate legal action to compel the former charter holder to convey title to the agency or other governmental entity authorized by the agency to maintain or dispose of property.

(j) A decision by the agency under this section is final and may not be appealed.

(k) The commissioner may adopt rules necessary to administer this section.

**Credits**

Added by Acts 2019, 86th Leg., ch. 631 (S.B. 1454), § 8, eff. June 10, 2019.

V. T. C. A., Education Code § 12.1281, TX EDUC § 12.1281
Current through the end of the 2025 Regular and First Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TAB 7:

TEX. EDUC. CODE §45.105

**Appx. 0045**

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
Education Code (Refs & Annos)
Title 2. Public Education (Refs & Annos)
Subtitle I. School Finance and Fiscal Management
Chapter 45. School District Funds
Subchapter E. Miscellaneous Provisions

V.T.C.A., Education Code § 45.105

§ 45.105. Authorized Expenditures

Currentness

(a) The public school funds may not be spent except as provided by this section.

(b) The state and county available funds may be used only for the payment of teachers' and superintendents' salaries and interest on money borrowed on short time to pay those salaries that become due before the school funds for the current year become available. Loans for the purpose of payment of teachers may not be paid out of funds other than those for the current year.

(c) Local school funds from district taxes, tuition fees of students not entitled to a free education, other local sources, and state funds not designated for a specific purpose may be used for the purposes listed for state and county available funds and for purchasing appliances and supplies, paying insurance premiums, paying janitors and other employees, buying school sites, buying, building, repairing, and renting school buildings, including acquiring school buildings and sites by leasing through annual payments with an ultimate option to purchase, providing advising support as described by Section 48.0035(1), and educating students as described by Section 48.0035(2), and, except as provided by Subsection (c-1), for other purposes necessary in the conduct of the public schools determined by the board of trustees. The accounts and vouchers for county districts must be approved by the county superintendent. If the state available school fund in any municipality or district is sufficient to maintain the schools in any year for at least eight months and leave a surplus, the surplus may be spent for the purposes listed in this subsection.

(c-1) Funds described by Subsection (c) may not be used to initiate or maintain any action or proceeding against the state or an agency or officer of the state arising out of a decision, order, or determination that is final and unappealable under a provision of this code, except that funds may be used for an action or proceeding that is specifically authorized by a provision of this code or a rule adopted under this code and that results in a final and unappealable decision, order, or determination.

(d) An independent school district that has in its limits a municipality with a population of 150,000 or more or that contains at

least 170 square miles, has $850 million or more assessed value of taxable property on the most recent approved tax roll and has a growth in average daily attendance of 11 percent or more for each of the preceding five years as determined by the agency may, in buying school sites or additions to school sites and in building school buildings, issue and deliver negotiable or nonnegotiable notes representing all or part of the cost to the school district of the land or building. The district may secure the notes by a vendor's lien or deed of trust lien against the land or building. By resolution or order of the governing body made at or before the delivery of the notes, the district may set aside and appropriate as a trust fund, and the sole and only fund, for the payment of the principal of and interest on the notes that part of the local school funds, levied and collected by the school district in that year or subsequent years, as the governing body determines. The aggregate amount of local school funds set aside in or for any subsequent year for the retirement of the notes may not exceed, in any one subsequent year, 10 percent of the local school funds collected during that year. The district may issue the notes only if approved by majority vote of the qualified voters voting in an election conducted in the manner provided by Section 45.003 for approval of bonds.

(e) The governing body of an independent school district that governs a junior college district under Subchapter B, Chapter 130,[1] in a county with a population of more than 2.5 million may dedicate a specific percentage of the local tax levy to the use of the junior college district for facilities and equipment or for the maintenance and operating expenses of the junior college district. To be effective, the dedication must be made by the governing body on or before the date on which the governing body adopts its tax rate for a year. The amount of local tax funds derived from the percentage of the local tax levy dedicated to a junior college district from a tax levy may not exceed the amount that would be levied by five percent of the no-new-revenue tax rate for the tax year calculated as provided by Section 26.04, Tax Code, on all property taxable by the school district. All real property purchased with these funds is the property of the school district, but is subject to the exclusive control of the governing body of the junior college district for as long as the junior college district uses the property for educational purposes.

(f) Funds from a junior college district branch campus maintenance tax levied by a school district board of trustees under Section 130.253 may be used as provided by that section.

**Credits**

Added by Acts 1995, 74th Leg., ch. 260, § 1, eff. May 30, 1995. Amended by Acts 1997, 75th Leg., ch. 1071, § 23, eff. Sept. 1, 1997; Acts 2011, 82nd Leg., ch. 1163 (H.B. 2702), § 10, eff. Sept. 1, 2011; Acts 2015, 84th Leg., ch. 1242 (H.B. 382), § 3, eff. Sept. 1, 2015; Acts 2019, 86th Leg., ch. 943 (H.B. 3), § 3.053, eff. Jan. 1, 2020; Acts 2021, 87th Leg., ch. 1046 (S.B. 1365), § 3.02, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 644 (H.B. 4559), § 21, eff. Sept. 1, 2023; Acts 2025, 89th Leg., ch. 918 (H.B. 120), § 12, eff. June 20, 2025; Acts 2025, 89th Leg., ch. 1065 (H.B. 2), § 6.12, eff. June 20, 2025.

Notes of Decisions (42)

---

**Footnotes**

[1]        V.T.C.A., Education Code § 130.011 et seq.

V. T. C. A., Education Code § 45.105, TX EDUC § 45.105
Current through the end of the 2025 Regular and First Called Sessions of the 89th Legislature.

**End of Document**                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Sifuentes on behalf of Joseph Nwaokoro
Bar No. 24032916
mary.sifuentes@oag.texas.gov
Envelope ID: 105909571
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellants Brief_Appendix
Status as of 9/22/2025 2:25 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joe Nwaokoro | | Joe.Nwaokoro@oag.texas.gov | 9/22/2025 2:20:42 PM | SENT |
| Mary Sifuentes | | Mary.Sifuentes@oag.texas.gov | 9/22/2025 2:20:42 PM | SENT |
| Melvin Houston | 793987 | mhouston@gotellmel.com | 9/22/2025 2:20:42 PM | SENT |
| Nikeyla Johnson | 24065505 | njohnson@contactjohnsonlawfirm.com | 9/22/2025 2:20:42 PM | SENT |